**HOMEOWNERS EMERGENCY LIFE PROTECTION COMMITTEE, an unincorporated association, Plaintiff,**

v.

**James T. LYNN, Individually and as Secretary of Housing and Urban Development, et al., Defendants.**

**No. CV 74–2917–AAH.**

United States District Court,
C. D. California.

Dec. 30, 1974.

Durwood J. Zaelke, Los Angeles, Cal., for plaintiff.

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civ. Div., Huston T. Carlyle, Jr., Asst. U. S. Atty., for Federal Defendants.

Burt Pines, City Atty., Edward C. Farrell, Chief Asst. City Atty., for Water & Power.

Kenneth W. Downey, Asst. City Atty., for defendants City of Los Angeles, Robert V. Phillips, Bd. of Water and Power Commissioners, Burton J. Gindler and William D. Sachau.

## DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

HAUK, District Judge.

On October 10, 1974, plaintiff Homeowners Emergency Life Protection Committee, an unincorporated association comprised of homeowners and taxpayers allegedly situated within the path which would be inundated in the event of a failure of the Los Angeles Dam and Reservoir, filed this action naming three "Federal defendants"—the Secretary of Housing and Urban Development, the Administrator of the Federal Disaster Assistance Administration [FDAA], and the Regional Director for Region Nine of the FDAA—and five "City defendants"—the City of Los Angeles, the General Manager and City Engineer of the City Department of Water and Power [DWP], the Chief Financial Officer of the DWP, the Board of Water and Power Commissioners, and the President of the Board of Water and Power Commissioners. The plaintiff requested this Court to prohibit any further action by any of these defendants with regard to the Los Angeles Dam and Reservoir [Dam] until the requisites of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1970) [NEPA], have been fulfilled. Concurrently, plaintiff filed a motion for a Temporary Restraining Order pursuant to Fed.R.Civ. P. 65(b) seeking to prevent the imminent award of contracts for the construction of the Dam at a meeting of the defendant Board of Water and Power Commissioners scheduled for that very day.

Upon completion of a hearing in chambers, at which all parties were represented, on October 10, 1974, this Court issued a Temporary Restraining Order prohibiting the Federal defendants for a period of ten days from "authorizing, approving, expending or taking other major Federal actions upon said request for Federal funding until such time as [they] . . . shall have complied with NEPA . . . ." The motion for a Temporary Restraining Order was denied as to the City defendants. By consent of the parties the Temporary Restraining Order as to the Federal defendants was extended for an additional ten days, and, pursuant to Fed.R.Civ.P. 65(a)(2) and Stipulation of all parties, plaintiff's motion for a preliminary injunction was consolidated with the trial on the merits held by the Court sitting without a jury on October 29 and 30, 1974.

## BACKGROUND

On February 9, 1971, an earthquake of 6.5 magnitude on the Richter Scale, and centered approximately two miles from the Van Norman Dam and Reservoir, severely damaged that Dam, which was the "key facility" in the water supply system of the City of Los Angeles. A substantial amount of the 20,000 acre feet of water in the Reservoir impounded by the Dam was removed to relieve the pressure on the Dam. The Van Norman Dam is now, and has been since that date, "permanently out of service."

On December 27, 1971, the City Council of defendant City of Los Angeles resolved, inter alia, that application be made to the Federal Office of Emergency Preparedness, now the FDAA,[1] pursuant to the Disaster Relief Act of 1970, Pub.L. No. 91–606, 84 Stat. 1744,[2] for funds to replace the damaged Van Norman Dam with the proposed Los Angeles Dam.[3] Subsequently, an amended application was filed on June 29, 1973, and a third one is now being prepared. The Federal government has not yet completed processing any of the City's applications.

On April 18, 1974, the defendant Board of Water and Power Commissioners authorized the DWP to begin advertising for construction bids for the proposed new Los Angeles Dam. On August 27, 1974, the bids were opened, and on October 10, 1974, plaintiff filed its motion for a Temporary Restraining Order upon the belief that the construction contract would be awarded on that date[4] and that the construction would commence shortly thereafter.

Plaintiff alleges that the proposed Dam

will have significant effects on the quality of the human environment including, but not limited to (i) effects on the land uses of the dam and reservoir sites, and on the surrounding land; (ii) effects on the population growth and distribution in the communities surrounding and served by the dam and reservoir; and (iii) effects on the health and safety of the population living beneath the dam posed by the danger of the dam failure.

Thus, according to the plaintiff, the construction of the Dam constitutes a "major Federal action significantly affecting the quality of the human environment" which, under the terms of NEPA, requires the preparation of what has become popularly known as an Environmental Impact Statement [EIS]. *See* 42 U.S.C. § 4332(2)(C)(i) (1970). Plaintiff contends that the Federal defendants here are the "responsible officials" charged in 42 U.S.C. § 4332(2)(C) with the preparation of an EIS, and that the City defendants are also charged with these same duties in this case because the making of the DWP application for Federal funds, coupled with the designing of the proposed Dam to meet eligibility requirements for Federal funding, make those defendants "an inexorable part of the proposed 'major Federal action.'" Thus, according to the plaintiff, NEPA requires all defendants herein to "preserve the status quo regarding the Los Angeles Dam and Reservoir pending completion of the EIS under NEPA." We disagree.

## CITY DEFENDANTS NOT BOUND BY NEPA

NEPA is, of course, a Federal statute and therefore places no obligations upon the City defendants here. The procedural requirements established by that statute only obligate "agencies of the *Federal* Government" and only concern

1. *See* Pub.L. No. 93–288, 88 Stat. 143 (May 22, 1974); Exec.Order 11795, 39 Fed.Reg. 25939 (July 11, 1974); 39 Fed.Reg. 28227 (Aug. 5, 1974).

2. Now superseded by the Disaster Relief Act of 1974, Pub.L. No. 93–288, 88 Stat. 143.

3. The new Los Angeles Dam will be located on a site approximately one-half mile north of the original Van Norman Dam.

4. A contract for $30,590,000 was in fact awarded on that date to Granite Construction Company of Watsonville, California.

"major *Federal* actions." 42 U.S.C. § 4332(2)(C) (1970) (emphasis added). The plaintiff seeks to avoid this overwhelming reality by alleging that, by some mystical process, the City defendants have become an "inexorable part" of a major Federal action and are therefore bound by NEPA. However, it is clear that the Dam here has not yet approached the status of a "major Federal action"—as even the plaintiff recognizes in its denomination of the Dam project as a *"proposed* 'major Federal action' . . . ." (emphasis added).

 Nonetheless, the plaintiff insists that the "ongoing relationship" between the City defendants and the Federal defendants herein with regard to the Dam transmutes the Dam project into a "major Federal action" which would invoke NEPA. In fact, from the initiation of the project to replace the Van Norman Dam, the U.S. Corps of Engineers and the U.S. Geological Survey have been involved in its planning. As a result of the consultations with and suggestions of the Corps and the Geological Survey, the new Los Angeles Dam project was modified to satisfy Federal requirements, in the hope of eventually securing Federal funding. Indeed, defendant Phillips, the General Manager and Chief Engineer of the DWP, stated in his March 18, 1974, letter to Los Angeles Mayor Thomas Bradley that because of this meticulous attention to Federal requirements, "DWP does not believe a basis exists for denial of reimbursement funds." But Phillips also stated in that same letter that even if Federal funds were denied, the DWP would proceed with the new Dam project and finance it through revenue bonds. And it should be noted that the DWP took this position with full knowledge of the FDAA's indication that it would take no action

on the City's application for funds until an EIS has been prepared [5] and that commencement of the project before that time could imperil possible funding by the FDAA. DWP nevertheless went ahead, awarded the construction contract for the new Los Angeles Dam on October 10, 1974, upon the authorization of April 18, 1974, and is actually using its own funds to proceed.

Notwithstanding these facts, the plaintiff contends that the actions of the Federal government heretofore described go beyond the "location approval" found by the Ninth Circuit in Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971) and La Raza Unida v. Volpe, 488 F.2d 559 (9th Cir. 1973), cert. denied, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974), to transform state highway projects into "Federal actions."

There are two obvious problems in relying upon this argument in this case. First, this is not a highway case, and, consequently, there will be no "location approval" required here as there is for Federal-aid highway projects under 23 U.S.C. § 103(f) (1970).[6] In this regard, we find the fact situation in City of Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972), involving airport aid, more closely analogous to the situation here. As the First Circuit there pointed out:

Federal aid highway planning is carried out in a number of discrete stages, with federal approval necessary at each stage. . . . The progression reflects an effort at orderly decision-making, providing for a narrowing of focus at each stage, with no pressure on the state seeking federal aid to telescope the stages into one, or, correspondingly, on the federal agency to make decisions on all stages at once. This perhaps grows out of the complexities of the federal

5. The projected date for completion of the EIS was June 15, 1975. An additional 30 days would then be required for review by the Council on Environmental Quality. *See* CEQ Guidelines, 40 C.F.R. § 1500.11 (1974). Hence a final decision would not be made before July 15, 1975.

6. For a comprehensive explanation of the intricacies of federal aid for highways, see La Raza Unida v. Volpe, 337 F.Supp. 221 (N. D.Cal.1971), aff'd, 488 F.2d 559 (9th Cir. 1973), cert. denied, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974).

highway statute, the need for coordination within and among the states, and the expectation of Congress that all states would participate significantly in each of the federal aid highway systems. . . .

In contrast, the airport aid scheme contemplates, so far as the statute is concerned, a single decision to fund or not to fund a project. 464 F.2d at 258–259.

We find that the Federal decision-making process in the present case is much more akin to the single decision involved in airport aid than the continuing process of Federal highway aid described above. Hence, there can be only one point in the "process" of Federal aid decision-making here at which a "major Federal action" can be said to take place —at the point of actual allocation of funds. And there has been no such allocation here.

Second, in both *Lathan*, 455 F.2d at 1120–1121, and *La Raza Unida*, 337 F. Supp. at 224, it was conceded by the government that "location approval" had in fact been given. This is not the case here. The Federal government has not "approved" the location of the Dam or taken any other analogous action.

■ Plaintiff next contends that the City defendants have entered into a "partnership" with the Federal defendants, thus making all defendants subject to the injunctive processes of this Court. The First Circuit Court of Appeals found such a "partnership" in Silva v. Romney, 473 F.2d 287 (1st Cir. 1973). That case is, however, clearly distinguishable from the instant matter. In *Silva*, HUD had already approved a $4,000,000 mortgage guarantee and an interest grant of $156,000. 473 F.2d at 288. Here, in contrast, there has been *no approval at all*. A First Circuit case more closely on point which the plaintiff unsuccessfully attempts to distinguish is City of Boston v. Volpe, *supra*. In *City of Boston* injunctive relief was denied

even though there had been a "tentative allocation" of funds pursuant to 14 C.F.R. § 151.21(c). 464 F.2d at 258. Here there has not even been such a tentative allocation, and hence we find that there is no "partnership" between the City defendants and the Federal defendants sufficient to invoke NEPA.

No injunction will issue against the City defendants in this case.

## FEDERAL DEFENDANTS ARE COMPLYING WITH NEPA

On February 15, 1974, HUD determined that the granting of any Federal funds for the Dam project would constitute a "major Federal action" requiring the preparation of an EIS. It is uncontested here that the Federal defendants are in the process of preparing such an EIS. It is also uncontested that they intend to complete that EIS before authorizing, approving, or expending any funds for the Dam project.[7] And, as indicated above, the FDAA has notified the City defendants that commencement of the project before such EIS has been prepared could endanger the possibilities of receiving Federal funds.

Thus it is clear that the Federal defendants are in the process of fully complying with NEPA, and the absence of any showing of "approval" of the Dam project by the Federal defendants or of a City-Federal "partnership," as indicated above, leaves this Court with no alternative but to find that there has been no "major Federal action" here upon which to base an injunction commanding compliance with NEPA.

We share the plaintiff's concern in this case. If the construction of the Dam is not halted, the project could be well on the way to completion before an EIS could be finished, thereby effectively foreclosing any realistic alternative site considerations. The Federal government could well be faced with the rather limited choice of funding the project where the City has chosen to lo-

7. The Council on Environmental Quality's Guidelines for the preparation of Environ-mental Impact Statements are found in 40 C.F.R. §§ 1500.1—.14 (1974).

cate it—even though the EIS might indicate a preferable alternative—or not funding it at all—an unlikely choice for any project of such general public importance. Thus the intent of NEPA could arguably be possibly frustrated by allowing construction to begin before there is any Federal involvement, making the equities at the point of Federal entrance into the project lie in favor of acquiescing in the pre-Federal-involvement location decision by DWP which was made without the benefit of an EIS.

Notwithstanding this arguable possibility of frustration of the Congressional purpose embodied in NEPA, that statute simply does not reach a project, such as the Dam here, where there has not yet been any Federal involvement. To find otherwise would require this Court to believe that there is some sort of covert, insidious plot between the City defendants and the Federal defendants here to abrogate NEPA. Such a finding could only rest upon an assumption that the defendants have been misleading the Court regarding their intentions, and have been acting in bad faith. Such an assumption we cannot and will not make.

We find that the plaintiff has not shown Federal involvement in this case sufficient to invoke NEPA or injunctive relief thereunder at this time.

## CONGRESSIONAL PURPOSE INDICATES THAT THE NEW DAM PROJECT IS NOT SUBJECT TO NEPA'S EIS REQUIREMENTS

A second, and perhaps more compelling reason to deny an injunction against the Federal defendants here is to be found in the Disaster Relief Act of 1974, Pub.L. No. 93–288, 88 Stat. 143. Section 402(a) of that Act permits Federal government contributions to state and local governments "to help repair, restore, reconstruct, or replace public facilities . . . which were damaged or destroyed by a major disaster." Section 405 provides:

No . . . assistance provided pursuant to section . . . 402 . . . of this Act that has the effect of restoring facilities substantially as they existed prior to the disaster, shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969 (83 Stat. 852).

Thus Congress expressed its intention that restoration activities of the sort here involved [8] need not be accompanied nor preceded by the EIS required by NEPA. We may disagree with this as a matter of public policy, but any such complaints must be taken up with the Congress and are not properly within the province of this Court. The statute itself is crystal clear.

The legislative history of this Act reveals that Congress was satisfied with the basics of the Disaster Relief Act of 1970, and that the new Act was designed to update and strengthen the earlier Act, to modify certain of its benefits, and to add several new provisions. S. Rep. No. 778, 93d Cong., 1st Sess. 1 (1974), U.S.Code Cong. & Admin.News 1974, p. 1114. The section 405 exemption from NEPA's EIS requirements was such an addition, for the 1970 Act had contained no such specific provision.[9]

---

8. The new Dam will essentially restore the reservoir function and other conditions that have existed on the same watershed site for 60 years, to wit: a regulating reservoir, a receiving reservoir for the First and Second Los Angeles Aqueducts bringing water to the City of Los Angeles from distant places, and an emergency storage facility that stores water in the City to provide water in the event of an emergency.

9. The regulations promulgated under that Act did provide that the Regional Director shall determine whether or not the quality of human environment may be significantly affected . . . . 32 C.F.R. § 1710.11(b) (6) (1971), recodified as 24 C.F.R. § 2200.-11(a)(2)(vi) in 39 Fed.Reg. 6697 (1974).

Consequently, the Senate Public Works Committee which originally drafted the section 405 exemption of the 1974 Act did not list this as one of the "significant amendments" to the 1970 Act, S. Rep. No. 778, 93d Cong., 1st Sess. 1–2 (1974); and the House Conference Report indicated only a minor change, not relevant to the present discussion, in section 405's coverage, H.R.Rep. No. 1037, 93d Cong., 2d Sess. 16 (1974).

 Thus the legislative history of the 1974 Act indicates that this exemption was not considered a policy shift regarding NEPA's application to restoration activities. We believe that section 405 of the Disaster Relief Act of 1974 evidences a continuing Congressional intent to relieve such activities of NEPA's EIS requirements. We therefore hold that there need be no EIS prepared in connection with this new Los Angeles Dam project.

## CONCLUSION

The plaintiff has not presented a case here which would indicate that an injunction should issue.

First, the plaintiff has presented no facts which would justify this Court in finding that the plaintiff will suffer irreparable injury if the Dam project is not immediately halted.

Second, a balancing of the equities here favors denial of an injunction in the public interest, as determined by the City and concurred in by this Court; and requires construction of a new dam as soon as possible to avoid extra costs due to inflation as well as to avoid possible inundation from collapse of the presently damaged dam,[10] and to restore the "key facility" in the supply of water to the City of Los Angeles. Moreover, in this balancing of the equities should be weighed the fact that the City defendants are not merely blundering ahead without consideration of environmental factors. They have received a permit to construct the Dam from the State Department of Water Resources, see Cal. Water Code §§ 6225–6230 (1971), and have submitted a detailed Environmental Impact Report as required by California law. Cal.Pub.Res.Code §§ 21151–21153 (Supp.1974). We thus find that the public interest on all counts favors allowing the defendants to carry on their efforts with respect to the new Los Angeles Dam project without hindrance by this Court.

Third, and most importantly, as indicated by the extensive discussion above, the plaintiff has presented no case on the merits against either the City defendants or the Federal defendants which would warrant this Court taking the action requested.

Therefore, neither a preliminary injunction nor a permanent injunction will issue against any of the defendants in this case, and it is hereby ordered, that the plaintiff's request for such relief be, and the same hereby is, denied.

In accordance with the foregoing, which shall also constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52, the Court now makes its formal Findings of Fact, Conclusions of Law and Order for Judgment.

## FINDINGS OF FACT

1. That this is an action for declaratory relief and injunction prohibiting both City and Federal defendants from taking any action which would affect the decision of the Federal and City agencies to approve construction of the proposed new Los Angeles Dam and from further soliciting or awarding any contracts in connection with the new Los Angeles Dam until the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1970) [NEPA] has been complied with.

2. That on February 9, 1971, an earthquake centered approximately two miles east of the Van Norman Dam and Reservoir occurred and as a result thereof, said Dam and Reservoir were severe-

---

10. The new Dam will impound only one-half (10,000 acre feet) of the volume formerly impounded by the Van Norman Dam (20,000 acre feet).

ly damaged. Said Dam and Reservoir are located in The City of Los Angeles and are important facilities in the Water System for The City of Los Angeles and its Department of Water and Power.

3. That the Board of Water and Power Commissioners of The City of Los Angeles determined that the Van Norman Dam is to be replaced by a new dam called the Los Angeles Dam and Reservoir. The replacement dam is on the same watershed and performs the same functions as the old dam. These functions include a regulating reservoir, a receiving reservoir for the First and Second Los Angeles Aqueducts bringing water to the City of Los Angeles from distant places, and an emergency storage facility that stores water in the City to provide water in the event of an emergency.

4. That the construction of the new Los Angeles Dam has the effect of restoring the facilities substantially as they existed prior to the disaster.

5. That the construction of the new Los Angeles Dam will essentially restore the reservoir function and other conditions that have existed on the site for 60 years.

6. That on June 29, 1973, the Chief Financial Officer of the Department of Water and Power for the City of Los Angeles requested that the State Office of Emergency Services file an amended application with the Federal Disaster Assistance Administration [FDAA] seeking Federal funds to reconstruct the damaged Van Norman Dam and Reservoir.

7. That on February 15, 1974, the Department of Housing and Urban Development determined that the granting of any Federal funds for the above-stated project would constitute a major Federal action and thus directed Thomas P. Dunne, of the FDAA in Washington, D. C., to prepare a Federal Environmental Impact Statement on the above-stated project.

8. That Thomas P. Dunne directed Robert C. Stevens, as Regional Director, Region 9, FDAA, to prepare the above stated Environmental Impact Statement for the above-stated project.

9. That Robert C. Stevens directed Joseph G. Del Monte, the Environmental Impact Statement project officer for said Los Angeles Dam and Reservoir Project and the Regional Environmental Clearance Officer, to coordinate all required and necessary Federal action so as to comply fully with NEPA.

10. That on April 10, 1974, the FDAA, Region 9, sent out a Notice of Intent to file a Federal Environmental Impact Statement to all appropriate Federal, State and local government agencies and officials and interested individuals and groups, including the plaintiff in the within action.

11. That on May 24, 1974, the FDAA, Region 9, informed Robert V. Phillips, General Manager and Chief Engineer of the Department of Water and Power, that the FDAA cannot and would not allocate or guarantee the disbursement of any Federal funds for the above-stated project until it had completed an Environmental Impact Statement under NEPA and that continuation of the project by the Department of Water and Power would be at their peril.

12. That on May 21, 1974, the FDAA informed plaintiff's counsel of the facts set forth in paragraph 11 concerning FDAA's position on the allocation of Federal funds.

13. That on August 5, 1974, the FDAA, Region 9, informed Robert V. Phillips, General Manager and Chief Engineer of the Department of Water and Power, that Federal action involving compliance with NEPA was in progress and that the final Environmental Impact Statement would not be completed and published until at least June 15, 1975, at which time a 30-day period for review by the Council on Environmental Quality (CEQ) would follow, and therefore any FDAA decision on Federal funding of the above-stated project would probably not be rendered until at least July 15, 1975.

14. That in 1973 the duties of the Office of Emergency Preparedness concerning Federal disaster assistance were transferred from the Office of Emergency Preparedness to the Secretary of Housing and Urban Development. Exec. Order No. 11725, 38 Fed.Reg. 17175 (1973).

15. That the Department of Housing and Urban Development then delegated to the FDAA the authority to provide Federal disaster assistance to qualified entities. Order D–73–238, 38 Fed.Reg. 17869 (1973).

16. That all relevant Executive relief functions pursuant to the Federal Disaster Relief Act of 1974 were delegated to the Secretary of Housing and Urban Development. Exec.Order No. 11795, 39 Fed.Reg. 25939 (signed July 11, 1974, published July 15, 1974, effective May 22, 1974).

17. That the Secretary of Housing and Urban Development re-delegated to the FDAA all relevant relief functions concerning the within action. 39 Fed. Reg. 28227 (Aug. 5, 1974).

18. That the FDAA implemented interim regulations concerning its relief functions under the Federal Disaster Relief Act of 1974. 39 Fed.Reg. 28212 (Aug. 5, 1974).

19. That on October 10, 1974, a construction contract in the amount of approximately $30,590,000 was awarded by the Board of Water and Power Commissioners of The City of Los Angeles to the Granite Construction Company of Watsonville, California, who is not a party to this action.

20. That the Department of Water and Power is obligated on its contract to Granite Construction Company and the Board of Water and Power Commissioners has determined that it will proceed with the construction of the new Los Angeles Dam regardless of whether Federal funding is available, and in fact, it is so proceeding with construction of the new Los Angeles Dam by the authorization and use of its own funds.

21. That the plaintiff has not sustained its burden of proof concerning the merits of the within action since there has been no violation of NEPA and since, if there has, the Federal Disaster Relief Act of 1974 makes any NEPA requirement for an EIS inapplicable.

22. That a balancing of the equities in the instant case weighs heavily in favor of all defendants and against the plaintiff.

23. That the plaintiff has not shown that it will be irreparably harmed if the preliminary and permanent injunction are not issued in the within action since (1) the above-stated project is not a major Federal action significantly affecting the human environment, (2) the Federal defendants are totally complying with the requirements of NEPA, and (3) even if (2) is incorrect, the Federal Disaster Relief Act of 1974 makes any NEPA requirement for an EIS inapplicable to the above-stated project.

24. That the only Federal action in the above-stated project concerns its processing of the defendant City's request for Federal funds and that no Federal decision concerning the allocation, disbursement, or commitment of said Federal funds has as of this date been determined.

25. That the Department of Water and Power of The City of Los Angeles has complied with the California Environmental Quality Act, Cal.Pub.Res.Code § 21000 et seq., and pursuant to that act has filed a comprehensive Environmental Impact Report and plaintiff did not challenge that report nor the new Los Angeles Dam and Reservoir Project in the State courts.

26. That the Department of Water and Power has received a permit to construct the new Los Angeles Dam from the State Department of Water Resources, Division of Safety of Dams, the California agency designed by law to administer safety of dams in the State.

27. That to the extent these Findings of Fact also contain Conclusions of Law, they shall be deemed incorporated within the Conclusions of Law.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331(a) and 2201.

2. In order for injunction to issue, the plaintiff must show that: (1) there is a strong likelihood or reasonable certainty of prevailing on the merits; (2) there will probably be irreparable injury to the plaintiff if the injunction is not granted; (3) public interest favors a maintenance of the status quo; and (4) a balancing of the equities or public interest favors the injunctive relief. Kaiser Trading Co. v. Associated Metals & Minerals Corp., 321 F.Supp. 923, 930 (N.D.Cal.1970); Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F. Supp. 1210, 1213 (N.D.Cal.1969). See King v. Saddleback Junior College District, 425 F.2d 426, 427, 429 (9th Cir. 1970); West Coast Construction Co. v. Oceano Sanitary District, 311 F.Supp. 378, 384 (N.D.Cal.1970). See also Robinswood Community Center v. Volpe, 506 F.2d 1366, 1368 (9th Cir. 1974), rehearing denied (Dec. 23, 1974); Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964).

3. The plaintiff has failed to meet any of these four preconditions because:

a. The above-stated project is not a major Federal action since there has been no Federal involvement other than the mere processing of a request for Federal funds and as of this date no disbursement, allocation, or commitment of Federal funds has been made to the above-stated project. City of Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972); Citizens for Balanced Environment and Transportation, Inc. v. Volpe, 376 F.Supp. 806 (D.Conn. 1974).

b. The plaintiff has not shown that it will be irreparably injured if the injunction is not granted, for all defendants are presently complying with existing law.

c. There has not been a sufficient showing to justify a maintenance of the status quo and the halting of the above-stated project by the City de-fendants and the above-stated processing by the Federal defendants.

d. A balancing of the equities weighs heavily in favor of defendants and against the plaintiff since there has been no violation of any law.

4. Alternatively, since the new Los Angeles Dam "has the effect of restoring facilities substantially as they existed prior to the disaster," Disaster Relief Act of 1974, Pub.L. No. 93–288, § 405, 88 Stat. 143, and since the regulations issued under the Disaster Relief Act of 1974 continue the Disaster Relief Act of 1970, and particularly section 252 of that Act, Pub.L. No. 91–606, tit. II, § 252, 84 Stat. 1757, in effect for "any major disaster declared prior to April 1, 1974," see 39 Fed.Reg. 28212 (Aug. 5, 1974), and since we find an express exemption from NEPA's requirements of an EIS in section 405 of the 1974 Act and look in vain for anything in the 1970 Act requiring adherence to NEPA's requirements of an EIS, it is clear beyond doubt that the new Los Angeles Dam, being a substantial restoration of the Van Norman Dam destroyed in the major disaster occurring and declared prior to April 1, 1974, is not bound by the NEPA requirements of an EIS.

5. All relevant Executive relief functions involved with the within action pursuant to the Federal Disaster Relief Act of 1974 were delegated to the Secretary of Housing and Urban Development pursuant to Executive Order No. 11795, 39 Fed.Reg. 25939 (signed July 11, 1974, published July 15, 1974, effective May 22, 1974).

6. The Secretary of Housing and Urban Development redelegated to the FDAA all relevant relief functions involved in the within action. 39 Fed.Reg. 28227 (Aug. 5, 1974).

7. The FDAA implemented interim regulations concerning its relief functions under the Disaster Relief Act of 1974. 39 Fed.Reg. 28212 (Aug. 5, 1974).

8. The alternative locations proposed by the plaintiff are not viable enough to compensate all of the concerns of the

above-stated project, and its present location as determined by the California Environmental Impact Report appropriately filed by DWP under the California Environmental Quality Act, Cal.Pub.Res. Code, § 21000 et seq., is the best of all alternatives presented to this Court.

9. That to the extent these Conclusions of Law also contain Findings of Fact, they shall be deemed incorporated within the Findings of Fact.

## ORDER FOR JUDGMENT

By reason of the foregoing Decision, Findings of Fact and Conclusions of Law, it is hereby ordered that Judgment be entered accordingly, denying plaintiff's motions for a Preliminary and Permanent Injunctions and dissolving the Temporary Restraining Order against the Federal defendants; and dismissing plaintiff's Complaint and cause of action therein alleged; but without prejudice to plaintiff's filing a new action based upon new and different facts showing, if plaintiff can do so, a violation by defendants of the requirements of NEPA.