**FRIENDS OF YOSEMITE, an unincorporated association, et al., Plaintiffs,**

v.

**Kent FRIZZELL, Acting Secretary of the Interior of the United States, et al., Defendants.**

**No. C–75–2144–CBR.**

United States District Court, N. D. California.

Sept. 27, 1976.

---

Harold McDermid, San Francisco, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty., David E. Golay, Asst. U. S. Atty., San Francisco, Cal., for federal defendants.

Rosenfeld, Meyer & Susman, John G. Davies, Beverly Hills, Cal., William Billick, Los Angeles, Cal., for defendants Yosemite Park and Curry Company, MCA Recreation Company, and MCA, Inc.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

This is a suit seeking declaratory and injunctive relief and compensatory and pu-

nitive damages from activities and projects being carried out in connection with the management of Yosemite National Park ("Yosemite"). Yosemite is located in the Sierra Mountains and extends over portions of the counties of Tuolumne, Mariposa, Madera, and Mono, California.

Plaintiffs in this action are Friends of Yosemite, an "unincorporated association of individuals; many [of whom] make considerable use of the camping and recreational facilities of Yosemite National Park" (Second Amended Complaint at 2); Schyler Liniger,[1] Executive Director of Friends of Yosemite; Ronald Warner, Barbara Billington, and Derik Skaggs, former employees of Yosemite Park and Curry Company and users of the park's recreational and camping facilities; and Fermene and Harry Coturri, users of the park's recreational facilities and shareholders in Yosemite Park and Curry Company. Defendants are various federal government officials connected with the administration of Yosemite[2] and three corporations, Music Corporation of America, Inc., and its wholly owned subsidiaries, Yosemite Park and Curry Company and Music Corporation of America, Recreation. Yosemite Park and Curry Company holds an exclusive franchise from the National Park Service for the operation of tourist accommodations and services in Yosemite.

Plaintiffs object to the construction of certain sanitation and housing facilities in Yosemite, the firing of three of the plaintiffs from employment in Yosemite, and the mounting of what plaintiffs allege to be a publicity campaign promoting the use of the park by business and associational conventions. (Second Amended Complaint at 4). Plaintiffs contend that the publicity campaign and the construction constitute a "breach of trust" by the National Park Service and violate an "administrative ruling" within the meaning of the Administra-

---

1. The status of plaintiff Liniger is uncertain. While named in the original and first amended complaints, he was not named in the second amended complaint and the Court is uncertain whether that omission was deliberate or inadvertent.

2. Kent Frizzell, Acting Secretary of the Interior of the United States; Rogers C. B. Morton, Secretary of Commerce of the United States; Howard H. Chapman, Director, National Park Service; and Leslie P. Arnberger, Superintendent of Yosemite National Park.

tive Procedure Act. Plaintiffs also contend that the discharge of the three plaintiffs deprived them of their rights "to exercise and engage in freedom of speech and expression, and to engage in protected labor activities without reprisals therefor" (Second Amended Complaint at 8) and that defendants failed to conform with the requirements of the National Environmental Policy Act ("NEPA").

## I. BREACH OF TRUST

■ Plaintiffs contend that the federal defendants' actions violate the duties imposed upon the Secretary of the Interior by the National Park Service Act, 16 U.S.C. §§ 1, 1a–1, 20 et seq., and thereby constitute a "breach of trust." The Supreme Court described the Secretary's fiduciary duties in Knight v. United States Land Association, 142 U.S. 161, 181, 12 S.Ct. 258, 264, 35 L.Ed. 974 (1891), where it held that the Secretary of the Interior has the power to order new surveys of public lands:

> "The secretary is the guardian of the people of the United States over the public lands. The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted or is disposed of to a party not entitled to it."

Plaintiffs rely upon Sierra Club v. Department of Interior, 376 F.Supp. 90 (N.D. Cal.1974), 398 F.Supp. 284 (N.D.Cal.1975), for the proposition that a breach of this fiduciary duty gives rise to a private cause of action. In that case, it was held that the court could compel the Secretary of the Interior to protect Redwood National Park where the Government "unreasonably, arbitrarily and in abuse of discretion [has] failed, refused and neglected to take steps to exercise and perform duties" imposed by law. 398 F.Supp. at 293. The court relied heavily upon the purpose and legislative history of the Redwood National Park Act,

16 U.S.C. §§ 79a–79j. 398 F.Supp. at 286–287.

It is unnecessary to decide whether a private right of action would exist for a breach of trust under the facts of this case,[3] because there is no evidence that any one connected with either the Department of the Interior or the National Park Service violated any legal duty. They have taken no actions that are not authorized by statute, nor have they failed to protect Yosemite in violation of any statutory duty. The sanitation facilities at issue here are authorized by 16 U.S.C. §§ 1b(2), (6) and are in compliance with Executive Orders 11507, 35 Fed.Reg. 2573 (1970), and 11752, 38 Fed. Reg. 34793 (1973), which require pollution abatement activities. Promotion of tourist travel to the park is clearly contemplated by 16 U.S.C. §§ 18, 18a–18d, 20a, and 20b.[4] In fact, plaintiffs admit that "[t]here is no question that the National Park Service has the authority and power to carry out construction, organize Master Plans, and authorize commercial advertising." Plaintiff's [sic] Opposition and Points and Authorities in Opposition to Federal Defendants [sic] Motion for Summary Judgement [sic] at 3 (filed May 3, 1976).

Plaintiffs' breach of trust contention really amounts to no more than an assertion that the federal defendants are wrong in their conclusion that the projects in question are not major federal actions significantly affecting the quality of the human environment. Plaintiffs have not alleged any facts which indicate bad faith or suggest that the Government has acted "unreasonably, arbitrarily [or] in abuse of discretion." See Sierra Club v. Department of Interior, supra, 398 F.Supp. at 293. Even assuming that the federal defendants erred in their decision not to issue an Environmental Impact Statement ("EIS"), it would not prove a breach of trust, but at most it would be a possible violation of NEPA.

---

3. For a discussion of the factors to be considered in such a determination, see Sierra Club v. Morton, 400 F.Supp. 610, 622–625 (N.D. Cal.1975).

4. The corporate defendants were responsible for replacing three employee tents with a mobile dwelling unit. Plaintiffs admit that their breach of trust theory applies only to the federal defendants.

## II. BREACH OF ADMINISTRATIVE RULING

 Nathaniel P. Reed, Assistant Secretary of the Interior for Fish and Wildlife and Parks, transmitted to the Director of the National Park Service a "memorandum" dated December 6, 1974, which expressed Reed's opinion that a proposed master plan for Yosemite was unsatisfactory and represented a departure from "our general philosophy of preserving the great natural resources of our national parks." Reed Memorandum at 1. Reed advised the National Park Service that "[t]he new planning process should get underway at once with maximum public involvement." *Ibid.* He also "recommended", *inter alia,* that:

"In the interim, until the new plans are finished and approved, there should be no construction of new units or facilities within the park and no expansion or upgrading of existing ones. Essential repairs and minor rehabilitations could be permitted, as long as the present number of pillows and/or units is not increased. Structures that are outmoded and unnecessary may be removed." Reed Memorandum at 2.

Plaintiffs argue that the Reed Memorandum has the force of a rule under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.,* and that this Court should decide whether the Park Service has complied with the memorandum. The only case plaintiffs cite is *Hammond v. Lenfest,* 398 F.2d 705 (2 Cir. 1968), a habeas corpus proceeding in which a divided Court of Appeals for the Second Circuit held that members of the Navy Reserve must be given the benefit of regulations concerning the administrative discharge of conscientious objectors. Neither a careful reading of *Hammond* nor plaintiffs' reference to it in their memoranda shed any light on its relevance to this case.

This Court is not authorized by the Administrative Procedure Act to review alleged violations of the Reed Memorandum, because the memorandum is neither a rule within the meaning of 5 U.S.C. § 551(4), nor an agency action within the meaning of 5 U.S.C. § 551(13). It merely expresses the Assistant Secretary's recommendations to the National Park Service. Even if the memorandum were a rule, it would seem to be excepted from the Administrative Procedure Act as "a matter relating to agency management or personnel or to public property * * * or contracts." 5 U.S.C. § 553(a)(2). Moreover, the Government has submitted an affidavit from Assistant Secretary Reed in which he discusses his memorandum and concludes:

"I do not consider any of the construction activity alluded to in the complaint in the above entitled action to be in conflict with the recommendations made to the Director of the National Park Service in my December 6, 1974 memorandum. On the contrary, I consider those activities to be essential to the conservation of the environment of Yosemite National Park and the waters therein." Reed Affidavit at 2.

## III. DISCHARGE OF THREE PLAINTIFFS

 Plaintiffs allege that corporate defendants wrongfully discharged plaintiffs Billington, Skaggs and Warner from their jobs at Yosemite, because they had been active in criticizing their employer's alleged exploitation of the park and because they had engaged in union-related activities. Plaintiffs also accuse corporate defendants of the unlawful conversion of Skaggs's property. This Court does not have jurisdiction over either of these claims.

Discharge of employees for union activities is an unfair labor practice within the meaning of § 8(a)(1) and (3) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1) and (3). *Signal Oil and Gas Company v. N.L.R.B.,* 390 F.2d 338, 341 (9 Cir. 1968). As the Supreme Court pointed out in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959):

"When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the * * * federal courts must defer to the exclusive competence

of the National Labor Relations Board * * *."

Plaintiffs should bring this claim before the N.L.R.B., not before this Court.

Title VII of the 1964 Civil Rights Act forbids an employer to discharge an employee because of his or her race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2(a)(1). Plaintiffs have no federal right, however, not to be discharged for criticizing their private employer. *See Ball v. Yarborough*, 281 F.2d 789 (5 Cir. 1960) (no federal jurisdiction where employee allegedly dismissed for testimony at a trial). Plaintiffs' reliance upon *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), is misplaced. That decision merely holds that the First Amendment restricts the reasons for which a board of education may discharge a public employee. *See* 391 U.S. at 568, 88 S.Ct. 1731.

Similarly, this Court has no jurisdiction to consider the alleged conversion of approximately $630.00 worth of Skaggs's possessions. This claim does not raise either federal question jurisdiction under 28 U.S.C. § 1331, or diversity jurisdiction under 28 U.S.C. § 1332. Nor does the claim derive from such "a common nucleus of operative fact" with the federal claims in this action as to warrant the exercise of the Court's discretion to grant pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725–726, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

## IV. NEPA CLAIMS

Plaintiffs contend that the Government should have filed Environmental Impact Statements before approving certain advertising by the corporate defendants and before authorizing the construction of the White Wolf Wastewater Treatment Facility ("White Wolf Facility"), the Tuolumne Meadows Wastewater Disposal, Flow Reduction and Receiving Station Facilities ("Tuolumne Meadows Facility"), and the Yosemite Valley Trunk Sewer Line segment ("Yosemite Trunk Sewer Line") of the Yosemite Regional Wastewater Collec-

tion Treatment and Disposal Facilities ("El Portal Project"). The Department of the Interior must file an Environmental Impact Statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

■ Government agencies have the initial responsibility to determine whether an EIS should be prepared, and the standard of judicial review is not whether the challenged project will in fact have a significant adverse effect on the environment, but "whether the responsible government agency has 'reasonably concluded' that the project will have no significant adverse environmental consequences." *City of Davis v. Coleman*, 521 F.2d 661, 673 (9 Cir. 1975). Nonetheless, the court in *City of Davis* goes on to emphasize that

"where substantial questions are raised as to whether a project will have significant adverse impacts it is hardly reasonable for an agency to conclude, prior to study, that an EIS is not required." 521 F.2d at 673.

### A. *Advertising*

■ Plaintiffs allege that the corporate defendants have mounted a publicity campaign designed to bring more tourists—including conventioneers—to Yosemite, and that the resulting increase in park use will have serious environmental effects. The question before the Court is whether an EIS should have been filed because the publicity campaign was a major federal action significantly affecting the quality of the human environment.

Defendants point out that the publicity in question is not a "federal action" at all—that the corporate defendants were responsible for any advertising that took place, and that the publicity was not subject to formal review or authorization by the Park Service. The corporate defendants do not normally submit advertising copy to the Park Service for approval, although they do present "unique, controversial, or otherwise unusual" copy to the office of Leslie P. Arnberger, Superintendent of Yosemite Na-

tional Park, on an informal basis. Affidavit of Leslie P. Arnberger, at 1–2.

The *Council on Environmental Quality Guidelines for Statements on Proposed Federal Actions Affecting the Environment*, 36 Fed.Reg. 7724 (1971), defines "actions" to include:

"(ii) Projects and continuing activities: directly undertaken by Federal agencies; supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance; involving a Federal lease, permit, license, certificate or other entitlement for use;

" * * * ."

The only case plaintiffs cite to support their assertion that the corporate defendants' advertising is a "federal action" is *Silva v. Romney*, 473 F.2d 287 (1 Cir. 1973), where the court held that, until an EIS was filed, a private developer could be enjoined from starting a housing project for which the Department of Housing and Urban Development had approved a $4,000,000 mortgage guarantee and an interest grant of $156,000, without which the housing project could not proceed. The court found the project to be the result of a "partnership" between the federal government and the private developer. 473 F.2d at 289.

The advertising in this case can hardly be called a partnership venture between the corporate and federal defendants. The facts here seem much closer to those in *Friends of Earth, Inc. v. Coleman*, 518 F.2d 323 (9 Cir. 1975), where the Court of Appeals for this circuit held that the Federal Aviation Administration did not need to file an EIS concerning the expansion of the San Francisco Airport, even though the agency had approved the plans and was supplying funds for part of the project. Characterizing the plaintiff's contention that an EIS must be prepared for state-funded parts of the airport expansion as "let[ting] the tail wag the dog," the court set out the following test for determining when another party's action becomes a "federal action":

"Determination of whether federal and state projects are sufficiently interrelated to constitute a single 'federal action' for NEPA purposes will generally require a careful analysis of all facts and circumstances surrounding the relationship. At some point, the nexus will become so close, and the projects so intertwined, that they will require joint NEPA evaluation." 518 F.2d at 329.

The undisputed facts of the instant case show that such a nexus does not exist with regard to the corporate defendants' advertising. *See Homeowners Emergency Life Protection Com. v. Lynn*, 388 F.Supp. 971, 975 (C.D.Cal.1974) (no partnership between city and federal government because of no allocation of federal funds).

### B. *Sanitation Facilities*

The White Wolf Facility consists of new wastewater treatment and disposal facilities replacing inadequate facilities for the White Wolf development. The White Wolf development is located one mile northeast of the Tioga Road and 4 miles southeast of Harden Lake in the Mather District of Yosemite National Park and is occupied from June through mid-September. It consists of a campground with 86 drive-in campsites and 3 modern comfort stations, concession lodge facilities with rental tents and cabins, food service facilities for 40 guests, and concession and government tent quarters. The prior treatment and disposal facilities consisted of a septic tank and leaching fields. The septic tank was undersized for present flows and inaccessible for pumping, and the leaching fields had plugged and failed due to the carry-over of solids in the septic tank effluent. The new facilities consist of a bar screen, a new 6-inch gravity pipeline, a lined stabilization pond, a pumping station, a chlorine contact chamber, a sprayfield, and an access road to the stabilization pond.

The Tuolumne Meadows Facility is designed to provide adequate waste disposal for the Tuolumne Meadows development, which is located on the Tioga Road 7 miles southwest of the Tioga Pass Entrance to Yosemite. Tuolumne Meadows is normally occupied from mid-May through October

and serves as the major focal point for visitors traveling the Tioga Road across the Sierra. It is the orientation point for visitors entering the park from the east and is the major gateway to the high-Sierra for backcountry users. The development consists of a 600-unit campground with modern comfort stations, concession lodge facilities with rental tents and food service facilities for 160 guests, and tent quarters for concession and government employees.

The Tuolumne Meadows Facility project includes gunite lining of an existing 1.7-acre evaporation pond, construction of a new 2.8-acre gunite-lined evaporation pond, and construction of an 8-acre sprayfield. The new facility will remedy the formerly inadequate treatment of effluent that is causing pollution in the Tuolumne River. The Tuolumne River flows into the Hetch Hetchy Reservoir which supplies water to the City and County of San Francisco. The purpose of the facility is to allow the disposal of effluent from the existing wastewater treatment plant and to make possible a wastewater flow reduction program. The program includes the reconstruction of the wastewater collection system to reduce infiltration, the replacement of conventional plumbing facilities with low-demand fixtures, and the construction of a receiving station for septage, vault and chemical toilet wastes.

The El Portal Project involves development of a regional wastewater system within the Merced River Basin above and at El Portal, California. The construction at issue in this case is the trunk pipeline system for collection of wastewater from Yosemite Valley. The new treatment plant is located outside the park on a piece of property obtained for such purposes and will not significantly detract from the surrounding environment. The existing valley treatment plant will be completely obliterated and the area will be returned to a state of nature. The project is intended to eliminate, above ground power lines, the threat posed to swimmers and hikers by the discharge of wastewater into the Merced River, and the uncontrolled odor emissions from the present treatment plant.

The Department of the Interior first issued draft environmental statements on the White Wolf and Tuolumne Meadows Facilities on February 12, 1973. Plaintiffs waited over 2½ years to file their lawsuit alleging that a full EIS should have been prepared. The White Wolf Facility was 100% complete and accepted before plaintiffs filed their first amended complaint in this suit. The Tuolumne Meadows Facility was approximately 85% complete when plaintiffs filed suit, and it is now 100% complete and accepted.

The El Portal Project was first publicized in May, 1972. A negative declaration and 101-page environmental assessment were filed in August, 1973; the contracts were awarded in November, 1974; and construction began by no later than January, 1975. The Sierra Club was informed of the proposal by the federal defendants before March of 1973 and offered its views and suggestions to the Department of the Interior between March, 1973, and December, 1974. Plaintiffs waited to file suit for over 3 years after the project was publicized, over 2 years after the environmental assessment and negative declaration were filed, and almost a year after construction was begun. At the time plaintiffs filed suit, the Yosemite Trunk Sewer Line was approximately 55% complete. It is now 100% complete.

■ "That the filing of an EIS should precede rather than follow federal agency action has been consistently recognized by the courts." *Cady v. Morton*, 527 F.2d 786, 794 (9 Cir. 1975) (footnote omitted). Plaintiffs had ample time to challenge these projects while they were still in the planning stages, and such a lawsuit is no longer timely at this late date. An environmental suit will be barred by laches when, as here, there has been a lack of diligence by the plaintiffs and injurious reliance thereon by the defendant. *See Lathan v. Volpe*, 455 F.2d 1111, 1122 (9 Cir. 1971) (plaintiffs barred by laches from seeking to enjoin

highway construction seven years after hearing because they knew of the hearing and its alleged deficiencies and defendants had "expended a substantial sum of money" in proceeding with construction); *Smith v. Schlesinger*, 371 F.Supp. 559, 561 (C.D.Cal. 1974) (plaintiffs barred by laches from seeking to enjoin Navy project 7½ months after commencement when the project was 35–40% completed and thousands of military personnel had been moved); *Iowa Student Pub. Interest Research Group v. Callaway*, 379 F.Supp. 714, 719–721 (S.D.Iowa 1974) (plaintiffs barred by laches from seeking to enjoin construction of a dam after it was 66% completed); *Clark v. Volpe*, 342 F.Supp. 1324, 1327–1330 (E.D.La.), *aff'd*, 461 F.2d 1266 (5 Cir. 1972) (plaintiffs barred by laches from seeking to enjoin highway construction where they had knowledge of the proposed construction but did not file a lawsuit until after construction had begun).

Plaintiffs have "slept on their rights." *See City of Davis v. Coleman, supra*, 521 F.2d at 677–678. By the time plaintiffs filed suit, and certainly by now, each facility had reached the stage of progress at which "the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom" that an EIS would serve no purpose. *See Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1331 (4 Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972). While the environmental assessments that were made are not as detailed as an EIS, they followed the same format and, under the circumstances, are sufficient.

On November 11, 1974, John H. Davis, Acting Department of the Interior Western Regional Director, signed and approved an environmental assessment, which concluded that the installation of a 3-unit prefabricated mobile dwelling at Camp 6, Yosemite Valley, would have no major or significant environmental consequences. The mobile unit already has been completed and put into place; it replaces three canvas tents formerly used by employees of Yosemite Park and Curry Company in a housing area containing approximately 60 other tents. The mobile dwelling was installed by the corporate defendants and can easily be removed, if necessary. Installation required no new electrical service, road construction, tree removal, or earth work other than the laying of approximately 75 linear feet of water pipe and sewer pipe. Plaintiffs have alleged no facts that cause this Court to doubt the reasonableness of the Department of the Interior's assessment that approval of the construction of this mobile unit was not a major federal action significantly affecting the quality of human environment. Moreover, while defendants have not submitted an affidavit directly on point, the evidence indicates that this project was also completed before plaintiffs commenced this lawsuit.

## V. ORDER

The above Memorandum of Opinion constitutes the Court's findings of facts and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure. Accordingly,

IT IS HEREBY ORDERED that defendants' motions for summary judgment are granted.

IT IS HEREBY FURTHER ORDERED that counsel for defendants shall promptly prepare an appropriate form of judgment, obtain approval of counsel for plaintiffs as to form, and submit it to the Court for execution. The parties shall bear their respective costs.