**SIERRA CLUB, a non-profit corporation, Plaintiff,**

v.

**DEPARTMENT OF the INTERIOR, an agency of the United States Government, et al., Defendants.**

**Civ. No. C–73–0163 WTS.**

United States District Court,
N. D. California.

July 16, 1975.

Micheal Sherwood, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., for Sierra Club.

Richard F. Locke, Asst. U. S. Atty., San Francisco, Cal., for Dep't of Interior.

## MEMORANDUM OF DECISION AND ORDER

SWEIGERT, District Judge.

This is an action by the plaintiff Sierra Club against the Department of the Interior and the Secretary of the Interior (hereafter "the Secretary") for declaratory and mandatory relief concerning the Secretary's alleged failure to discharge his statutory and fiduciary duty to protect Redwood National Park from damage caused by logging operations on privately owned lands immediately adjacent to and surrounding certain portions of the Park.

In an earlier Memorandum of Decision, filed herein on May 13th, 1974, this court held that the Secretary does have certain statutory and fiduciary duties with respect to the Park and that plaintiff had alleged in its amended complaint facts which, if established would justify the declaratory and mandatory relief prayed. *Sierra Club v. Dept. of the Interior*, 376 F.Supp. 90 (N.D.Cal.1974). The court has now heard the evidence and argument and sets forth herein its findings and conclusions.

### I. *Issue of Standing of the Sierra Club to Sue*

The evidence indicates, and the court finds, that the Sierra Club is a national conservation organization having approximately 150,000 members, whose stated corporate purposes include the enhancement and protection by all lawful means of the national and state forests and parks. Representatives of the Sierra Club lobbied extensively and testified before Congress in favor of legislation establishing a Redwood National Park. Since the establishment of the Park in October, 1968, the Sierra Club has continued to display an active interest in its administration by preparing and submitting to the defendants critical comments on Park studies performed by them, by giving additional Congressional testimony, and by engaging in numerous meetings, discussions, and oral and written communications with the defendants concerning the Park.

In addition, individual members of the Sierra Club have used the lands included within the Park, both before and after its establishment, for various purposes, including hiking, camping, photography, and other forms of physical and spiritual recreation. To the extent that the resources of the Park are being damaged by the Secretary's failure to take ade-

quate steps to protect them from the surrounding logging operations, as is discussed in more detail below, the aesthetic, conservational, and recreational interests of these individual members of the plaintiff have been injured in fact within the meaning of *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 683–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The filing of this lawsuit on behalf of the members of the Sierra Club was duly authorized by the Executive Committee of its Board of Directors on June 16, 1973.

■ Under these facts plaintiff Sierra Club has standing to maintain this action. *Sierra Club v. Morton, supra; United States v. SCRAP, supra; Natural Resources Defense Council v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974); *Sierra Club v. Leslie Salt*, 354 F.Supp. 1099, 1103 (N.D.Cal.1972).

## II. *On the Merits*

*The Legislative Background:*

The Redwood National Park, situated in the counties of Del Norte and Humboldt, Northern California, was created on October 2, 1968, by the Redwood National Park Act, 16 U.S.C. §§ 79a–79j (hereafter "the Act"). The purpose of the park, as set forth in the Act, is

"to preserve significant examples of the primeval coastal redwood (Sequoia semper-virens) forests and the streams and seashores with which they are associated for purposes of public inspiration, enjoyment, and scientific study . . .." 16 U.S.C. § 79a.

The Act authorized acquisition of not more than 58,000 acres of previously privately owned land for which the United States was to pay just compensation, 16 U.S.C. § 79c(b). It authorized $92,000,000 for this land acquisition, 16 U.S.C. § 79j; of that $92,000,000 only $72,000,000 has been actually appropriat-

ed thus far by the Congress; of that $72,000,000, $2,800,000 remains unspent.

■■ As stated in this court's previous opinion the issue for decision is whether the Secretary, since the establishment of the Park, has taken reasonable steps to protect the resources of the Park and, if not, whether his failure to do so has been under the circumstances arbitrary, capricious, or an abuse of discretion. As this court also pointed out in its previous opinion, reviews of decisions of the executive branch—such as here requested—lie in the narrowest area of judicial review wherein the court must stop short of merely substituting its own judgment for that of the Secretary. His acts are presumptively reasonable and in accordance with law and are subject to judicial intervention only when the executive conduct fails to accord with law or is otherwise arbitrary or an abuse of discretion.

In the pending case the conduct of the Secretary must be considered in the light of a very unique statute—a statute which did more than establish a national park; it also expressly vested the Secretary with authority to take certain specifically stated steps designed to protect the Park from damage caused by logging operations on the surrounding privately owned lands.

As the legislative history shows, these specific provisions were put into the statute because the Park boundaries authorized by Congress represented a compromise and did not include certain lands within the Redwood Creek Watershed upslope and upstream from the southernmost portion of the Park. Out of its concern that continued logging operations on those privately owned lands could cause damage within the Park, the Congress expressly invested the Secretary with these specific powers to take administrative action designed to protect it.

These specific powers include:

(1) power to modify the boundaries of the Park with particular attention to minimizing siltation of the streams,

damage to the timber and preservation of the scenery, 16 U.S.C. § 79b(a).

(2) power to acquire interests in land from and to enter into contracts and co-operative agreements with the owners of land on the periphery of the Park and on watersheds tributary to streams within the Park designed to assure that the consequences of forestry management, timbering, land use and soil conservation practices conducted thereon, or the lack of such practices, would not adversely affect the timber, soil and streams within the Park, 16 U.S.C. § 79c(e). [Note [1] (see appendix)]

(3) power to acquire lands and interests in land bordering both sides of the highway near the town of Orick to a depth sufficient to maintain a corridor —a screen of trees between the highway and the land behind the screen and the activities conducted thereon, 16 U.S.C. § 79c(d).

As pointed out in this court's previous decision, there is, in addition to these specific powers, a general trust duty imposed upon the National Park Service, Department of the Interior, by the National Park System Act, 16 U.S.C. § 1 et seq., to conserve scenery and natural and historic objects and wildlife [in the National Parks, Monuments and reservations] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations (see: *Knight v. United Land Ass.* 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 [1891]).

*The Evidence*

The evidence in the pending case shows that, beginning in April of 1969, the Secretary has conducted a series of five consecutive studies of damage and threats of damage to the Park caused by the logging operations of certain timber companies on adjacent lands.[2] These studies have resulted in many specific recommendations for steps to be taken

by the Secretary, pursuant to his various powers set forth in the statute, to prevent or minimize such damage.

*The Stone Report—1969*

The first such study was prepared for the National Park Service (NPS) by Stone and Associates. It is dated April 30, 1969, and is entitled "Redwood National Park, California: An Analysis of the Buffers and the Watershed Management Required to Preserve the Redwood Forest and Associated Streams in the Redwood National Park" (hereafter, "The Stone Report"). Exhibit P–2.

The Stone Report concluded, *inter alia,* that:

"There are a number of potentially destructive inputs from land adjacent to the Park and from watersheds tributary to the Park. The inputs which affect the preservation of the redwood forest within the Park are fire, wind, water moving downslope into the Park, soil moving downslope into the Park—either along the surface or in the form of slides—and band-cutting during peak flows. The inputs which can affect the preservation of the streams are peak flows and sediment loads moving along the streambeds as gravel and rocks or carried in suspension as silts and clays. The magnitude of these potential inputs are [sic] closely tied to the management practices [on the adjacent lands] and can be increased or reduced by modifying these practices." *Stone Report,* p. 88 (Summary, ¶ 4).

The Stone Report recommended that in order to minimize these potentially adverse inputs and threats to the Park resources,

"Buffers must be established around all perimeters of the Park where redwood ecosystems are to be protected. The basic design for these buffers around most of the Park is the establishment of young growth redwood coppice stands, 800 feet wide on all

2. The operations are conducted by the Arcata Redwood Company, the Louisiana-Pacific Corporation, and the Simpson Timber Company (hereafter, "the companies").

forested perimeters. . . . Basic buffer design and management, however, must be adopted and modified according to soil, topography, and timber stand situations in order to control specific potential inputs." *Id*, p. 88.

The Stone Report made specific recommendations of twelve different types of buffers for different sections of the Park and noted that the costs of installing and managing specific buffers will vary. *Id*, pp. 72–82, 89.

The Stone Report noted that "[f]rom the view of potential destructive inputs into the Park, the next decade or so will probably be most critical," page 55, and emphasized therefore that such buffers should be established "as quickly as possible." *Id*, p. 2.

The Stone Report also recommended that a "landscape plan" of the Park "be completed by a Master Plan team before the preservation responsibility is handed over to the Park administrator." *Id*, p. 14.

*Preliminary Draft Master Plan—1971*

In August, 1971, the defendants published a "preliminary working draft" of a Master Plan for the Park. Exhibit P–6(a). The Preliminary Draft Master Plan emphasized that one of the important resources offered by the Park is the aesthetic and spiritual quality of old growth redwood groves. *Preliminary Draft Master Plan,* pp. 6; 7; 13–14. The Preliminary Draft Master Plan also pointed out that

"During the conversion period [the next 12–18 years, as of the date of the Preliminary Draft Master Plan], the potential for destruction of Park forests, streams, and soils as a result of logging on the adjacent lands and tributary watersheds, will be considerable, unless the industry exercises unusual restraint." *Id*, p. 45.

While not making specific recommendations as such, the Preliminary Draft Master Plan stated that in order to protect these resources from the logging operations,

"The [Park] Service's primary efforts should be directed to the establishment of effective buffers with the adjacent landowners . . .," *id,* p. 10,

and that

"Protecting a few acres of trees will not have much significance if the lands surrounding these trees are barren of redwoods and the waters entering the Park are polluted." *Id*, p. 8.

The Preliminary Draft Master Plan also emphasized that

"The implementation of a [final] Master Plan is an integral part of the management of Redwood National Park and a prerequisite to full public use and enjoyment of the Park." *Id,* p. 26.

No final Master Plan for the Park has yet been prepared by the defendants.

*The November 1971 NPS Proposal—1971*

In November, 1971, the National Park Service prepared a document entitled "Redwood National Park: Proposals for Implementation of the Discretionary Authority Granted to the Secretary of the Interior Pursuant to the Act of October 2, 1968 [Public Law 90–545]" (hereafter "the November 1971 NPS Proposal"). Exhibit P–8. The November 1971 NPS Proposal made recommendations for action to be taken by the Secretary under Sections 79b(a) (Boundary Modification), 79c(d) (Scenic Corridor), and 79c(e) (Protection of the Timber, Soil and Streams Within the Park) of the Act.

With respect to § 79b(a), the November 1971 NPS Proposal noted that:

"Surveys show that the Redwood National Park (those lands taken by the Act and those lands included in the State Parks) actually includes 56,205 acres. Thus, the Secretary may adjust the boundaries of the Park to include an additional 1,795 acres." *November 1971 NPS Proposal,* p. 2.

The Proposal recommended that:

"The additional lands to achieve the 58,000 acres authorized for inclusion in the Park be selected from the Skunk Cabbage Creek watershed at an estimated cost of $19,800,000." *Id*, p. 7.

With respect to § 79c(d), the November 1971 NPS Proposal recommended that the Secretary:

"Acquire in fee a 75-foot zone on each side of the highway right-of-way beginning near the juncture of Prairie Creek and Redwood Creek and extending northward approximately 3½ miles to the boundary of the Redwood National Park . . . The corridor could be planted and managed for screening purposes."

The estimated cost of this recommended acquisition was $1,000,000. *Id*, p. 9.

With respect to § 79c(e), the November 1971 NPS Proposal stated that:

"Significant Park resources are subject to impairment from the effects of on-going forestry practices in the Redwood Creek area . . . [S]ignificant old growth redwood stands exist on the slopes above Park boundaries, and are being logged under practices that will soon leave clearcut slopes extending from the boundary to the ridge tops. This will produce adverse effects on Park resources.

"Without application of special forest management practices to control present clearcutting methods, remaining old growth redwood within the Park will be subject to wind throw. Steep slopes will erode severely producing major slides in unstable soils known to exist in the area. Water quality of Park streams will deteriorate as a result of siltation.

"It is essential therefore that a buffer zone comprising about 10,000 acres be established to protect the Redwood Creek area of the Park." *Id*, p. 11.

While acknowledging that acquisition by the government of fee title to such a buffer "would assure the fullest protec-

tion of Park Resources by removing the lands from further cutting for timber production," the November 1971 Proposal did not recommend fee acquisition because of the estimated cost of $74,200,000. *Id*, p. 12. Instead, the November 1971 NPS Proposal recommended acquisition, pursuant to § 79c(e), of less-than-fee "management easements" in the proposed 10,000 acre buffer zone, which would

"achieve the objective of protecting Park resources from the harmful effects of forestry and land management practices on adjoining lands. It is essential to restrain current logging methods which seek maximum harvest over short time intervals through clearcut harvesting of large blocks, and employ the use of bulldozers for hauling." *Id*, pp. 12–13.

The November 1971 NPS Proposal recommended that the said management easements require:

"1. That the old growth redwood be harvested over a 20 year period to assure a gradual conversion to second growth redwood on lands adjacent to the Park.

"2. Alternate patch-cutting in units not to exceed 12 acres.

"3. Logging by the use of the cable system rather than bulldozers.

"4. Retention of the lands perpetually for commercial forest production." *Id*, p. 13.

The November 1971 NPS Proposal also recommended, pursuant to Section 79c(e), that, in conjunction with the management easements,

"The United States would acquire *in fee* lands along tributary streams to preserve a protective canopy of old growth timber and provide for public access and use. Fee acquisition by the Service, will be undertaken to preserve water quality through minimizing erosion, slides, and siltation." *Id.*, p. 13.

The total acquisition cost of such management easements and fee lands along

tributary streams and unstable areas was estimated to cost $17,200,000. *Ibid.*

### The Curry Task Force Report—1973

In February, 1973, the defendants released a document prepared by Dr. Richard Curry, an official within the Department of the Interior, entitled "Redwood National Park: Resource Management Actions Affecting Redwood Creek Corridor—Options Paper" (hereafter the "Curry Task Force Report"). Exhibit P-9. The Curry Task Force Report (as did the Stone Report and the November 1971 NPS Proposal before it) set forth in detail the damage and threats of damage to the Park resources posed by logging practices on the lands adjacent to the Park. These included the aggradation and deflection of the main channel of Redwood Creek and of the tributaries thereto due to high sediment loads which in turn causes the undercutting of banks, the toppling of streamside redwoods, and the triggering of additional accelerated landslide, erosion, and gullying activity. *Curry Task Force Report*, pp. 2; 4–5; 6; 7; 9–10. The Curry Task Force Report found, as did the earlier reports, that, while landslides, erosion, and consequent high sediment loads in Redwood Creek are naturally occurring phenomena within the Redwood Creek watershed, man's timber harvesting activities within the watershed accelerate and aggravate these natural processes.[3] In this regard, the Curry Task Force Report specifically identified such timber harvesting practices as clearcutting, the use of bulldozers within unstable areas to yard logs, and the construction of layouts and road systems over steep and unstable terrain. *Id.*, pp. 4–5.

The Curry Task Force Report made five specific recommendations for actions to be taken by the Secretary:

"1. Since the greatest threat to the Park emanates from man-induced acceleration of natural erosion processes, it is imperative that present land use practices be revised. The Secretary must secure the cooperation of the companies . . . to use harvesting techniques that minimize the degree of ground surface and vegetation disruption and to perform maintenance management on the harvested land in an effort to reduce the rate of erosion in these areas.

"These actions might include but are not limited to:

"a. Cable logging or such other system that minimizes ground disruption.

"b. More sensitive placement of the road net so as to minimize land slippage.

"c. A high performance road maintenance system which would include an effective erosion control program. . . .

"d. Application of stabilization procedures in active slide areas.

"e. Minimize the burning of slash.

"f. Planting of areas where regeneration from seeding and/or sprouting may be difficult.

"2. The Secretary should seek by cooperative agreement with the companies at least a two-year cutting moratorium extending at least 75 feet from the bank of all second order and higher tributary streams that are upslope from the Corridor. The purpose is to permit the accumulation of baseline data for these streams. At the end of the period, the companies would be permitted to continue with their operations as long as the integrity of the stream is maintained.

"3. The acquisition in fee of a management zone around the 'worm' portion of the Redwood Creek unit that would be contoured to deal with specific impact and terrain conditions. The buffer would average 800 feet in

3. Indeed, the Curry Task Force Report termed man-induced acceleration of natural erosion processes "the greatest threat to the Park." *Id.*, p. 16.

width or encompass approximately 1,650 acres. . . .

"4. The Secretary should make available consultative services such as landslide data to the operating companies.

. . .

"5. The Secretary should direct the National Park Service, in cooperation with the U.S. Geological Survey, to maintain a stream monitoring system along the main channel of Redwood Creek. . . ." *Id.*, pp. 16–17.

*The Earth Satellite Report—1972*

In conjunction with the Curry Task Force Report, the National Park Service, by contract, obtained from the Earth Satellite Corporation of Berkeley, California, a photographic documentary of the natural and man-induced erosion, mud flow, and landslide processes within the Park dated April, 1972, and entitled "Aerial Photographic Documentation of Terrain and Vegetation Conditions in Redwood National Park and Adjoining Areas: Special Report" (The "Earth Satellite Report"). Exhibit P–10.

The Earth Satellite Report also listed specific logging practices that accelerate and accentuate the naturally occurring erosional processes within the Park:

"(1) The use of tractors instead of some form of high lead cables for yarding. . . .

"(2) The removal of all merchantable trees by 'clearcutting' instead of only a few by 'selective logging'.

"(3) The construction of roads on steep side slopes. . . .

"(4) The construction of culverts too small to accommodate peak runoff or topographically sited in improper places.

"(5) The conducting of logging operations in wet seasons as well as dry ones." *Earth Satellite Report,* Summary and Conclusions, p. 1.

It will be noted that the foregoing official recommendations include among other things: acquisition of additional acreage to modify the Park boundaries, bringing the total acreage of the Park up to the authorized 58,000 acre limit; acquisition of a scenic corridor; acquisition of a fee buffer "management zone" of 1,650 acres, or less-than-fee "management easements" in a 10,000 acre buffer zone; acquisition of the fee in lands along tributary streams, or at least the imposition of a two-year cutting moratorium along such streams until other studies are completed; also acquisition of the fee in lands outside the buffer in unstable areas.

Over and beyond these official studies, reports and recommendations initiated by or for the Secretary, the plaintiff, Sierra Club, has made its studies and has submitted its recommendations to the Secretary. However, we prefer to appraise the conduct of the Secretary, in this case, not by outside recommendations, but by his own official studies and recommendations as above set forth.

The evidence shows, and the court finds, that to date the Secretary has not implemented any of the recommendations made by or on behalf of his own agency in the above mentioned studies except (1) to enter into so-called "cooperative agreements" with the timber companies who own and operate on the lands surrounding the Park and (2) to conduct further studies.

*Defendants' Contentions*

The Secretary contends that these cooperative agreements amount to reasonable compliance with the intent of the statute and with his trust duties, pointing out that the timber companies voluntarily abstained from logging operations within an 800-foot zone of the Park until 1973 when they resumed logging under the so-called cooperative agreements; that their operations since 1973 have conformed to these agreements and that the agreements have restrained the harvesting practices of the timber companies and have thus mitigated damage to the Park.

The Secretary further points out that he is presently conducting another study through the U.S. Geological Survey of the Redwood Creek watershed and that this study, headed by a Dr. Richard Janda, is expected to be completed by the fall of 1975, at which time the Secretary will be in a position to further consider the Park situation.

The Secretary also contends that his failure to thus far implement other recommendations made by his own agency has been reasonable because of lack of sufficient scientific data to justify some of the recommendations already received and because of lack of the funds that would be required for the adoption of others.

More specifically, the Secretary contends that the November 1971 staff recommendations for obtaining management easements was never adopted because of insufficient data to justify these recommendations; that the February 1973 Curry Task Force Report recommendation that cooperative agreements with the timber companies include a two-year cutting moratorium and certain fee acquisitions was never implemented because of lack of funds, arguing that presently authorized funds are subject to priority claims for payments to those whose lands have already been taken for the Park. [Note 4 (see appendix)]

*Plaintiff's Contentions*

On the other hand, plaintiff Sierra Club contends that the Secretary has complied with neither the intent of the statute nor with his general fiduciary duty to protect the Park; that the steps taken thus far, mainly the so-called cooperative agreements, do not meet the recommendations of his own studies and are inadequate to protect the Park; and that his failure to implement those recommendations and to take effective action has been and is under the circumstances arbitrary, capricious, and an abuse of discretion.

Plaintiff contends and the Court finds that the so-called cooperative agreements with the three timber companies [5] are in fact not contracts or cooperative agreements within the meaning of Section 79c(e) because only one has been signed by one of the timber companies, and none of them has been signed by the Secretary; that they are, therefore, not legally binding contracts enforceable against the timber operators; also that, even if the so-called cooperative agreements were enforceable, their language is so general and so full of qualifications as to render them practically meaningless and unenforceable for that reason as well; also, that in any event the so-called cooperative agreements do not purport to carry out any of the recommendations of the defendants' studies with the arguable exception of Recommendation Number One of the Curry Task Force Report and, indeed, are contrary to other specific recommendations.

For example, the November 1971 NPS Proposal recommended that clearcutting within a 10,000 acre buffer zone be allowed only "in units not to exceed 12 acres." The so-called cooperative agreements, however, impose restrictions on clearcutting only in a less than 2,000 acre buffer, and even there, allow clearcut "patches" "of approximately 20 acres with full recognition that adjustments in size may be required"; that in practice the latter qualification has invariably resulted in clearcuts larger than 20 acres—seldom smaller.

The Court further finds that the cooperative agreements do not fully implement even Curry Task Force Recommendation Number One in that the agreements set up an arbitrary 800 foot area surrounding the corridor portion of the Park while the recommendations do not so limit the harvesting restrictions.

The Court also finds that, even assuming none of the above deficiencies existed, the restraints placed upon the companies by the so-called cooperative

---

5. There are three so-called cooperative agreements, one for each company. While differing in detail, their substantive provisions are essentially identical.

agreements are unreasonably inadequate to prevent or reasonably minimize damage to the resources of the Park resulting from timber harvesting operations; that there is substantial on-going damage presently occurring to the timber, soil, streams, and aesthetics within the Park downslope from and as a result of clearcutting within the so-called buffer zone, even as such clearcutting is done in conformity with the so-called cooperative agreements.

With respect to the defendants' contentions concerning unavailability of funds, the Court further finds that it is the Congress which must make the ultimate determination whether additional sums should be authorized or appropriated and also the ultimate determinations concerning the items to which such funds should be applied; that the Secretary has never yet gone to the Congress, through the executive or otherwise, either to request the appropriation of the balance of money authorized by the statute, or to obtain whatever additional sums of money may be necessary to implement the specific powers of the statute designed for the protection of the Park.[6]

Finally, the Court finds that in light of the emphasis in each of the Secretary's own studies that time is of the essence, the Secretary has taken (to the detriment of the Park) an unreasonably long period of time to negotiate the proposed cooperative agreements. Although no cutting took place in the 800 foot "buffer" area until 1973, cutting was occurring during the years of negotiation prior to 1973 within the 10,000 acre buffer recommended in the November 1971 NPS Proposal, and along many of the tributary streams where the National Park Service in 1971 had recommended fee acquisition and where the Curry Task Force Report recommended a two year cutting moratorium.

With respect to the Secretary's present on-going Dr. Janda study, the court finds that the studies already conducted since 1969 have documented in detail the fact that the logging operations on the lands surrounding the Park were and are in fact damaging the various resources of the Park, and that further studies will serve merely to further document the need for what has already been recommended.

### III.  *Conclusions and Order*

The foregoing findings must be considered in the light of what might be called an implied recognition by the defendants of some degree of fault on their part. This recognition is evidenced by the fact that, prior to the time the Curry Report was released to the public (which was not until after and as a result of legal steps taken in this action by the Sierra Club under the Freedom of Information Act), the Department of Interior had intentionally removed from the Report the last two pages which contained the five recommendations for action to be taken by the Secretary of the Interior. The existence of these last two pages was thereafter discovered only in the course of subsequent discovery proceedings which were initiated by the Sierra Club in the instant action.

█ With all due respect for the narrow limits of judicial intervention in matters entrusted primarily to executive agencies, the Court concludes that, in light of the foregoing findings, the defendants unreasonably, arbitrarily and in abuse of discretion have failed, refused and neglected to take steps to exercise and perform duties imposed upon them by the National Park System Act, 16 U.S.C. § 1, and the Redwood National Park Act, 16 U.S.C. § 79a, and duties otherwise imposed upon them by law; and/or that defendants have unreasonably and unlawfully delayed taking such steps.

Therefore, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (particularly at § 701(a), § 706(1)

---

6. The only step taken by the Secretary in this direction was to consult, not the Congress, but only the Executive Office of Management of the Budget (OMB) concerning the recommendation of the Curry Report that certain property be acquired in fee; the OMB evidently advised against such acquisition.

and § 706(2)(A)); the Mandamus Act, 28 U.S.C. § 1361; the National Park System Act, 16 U.S.C. § 1 et seq.; Redwood National Park Act, 16 U.S.C. § 79a et seq.; and other applicable law, it is hereby ordered:

That defendants Secretary of the Interior and Assistant Secretary for Fish, Wildlife and Parks, take reasonable steps within a reasonable time [7] to exercise the powers vested in them by law (particularly 16 U.S.C. §§ 79c(e), 79c(d) and 79b(a)), and to perform the duties imposed upon them by law (particularly 16 U.S.C. § 1), in order to afford as full protection as is reasonably possible to the timber, soil and streams within the boundaries of the Redwood National Park from adverse consequences of timbering and land use practices on lands located in the periphery of the Park and on watershed tributaries to streams which flow into the Park; that such action shall include, if reasonably necessary, acquisition of interests in land and/or execution of contracts or cooperative agreements with the owners of land on the periphery or watershed, as authorized in 16 U.S.C. § 79c(e); that such action shall include, if reasonably necessary, modification of the boundaries of the Park, as authorized in 16 U.S.C. § 79b(a); and that such action shall include, if reasonably necessary, resort to the Congress for a determination whether further authorization and/or appropriation of funds will be made for the taking of the foregoing steps, and whether the powers and duties of defendants, as herein found, are to remain or should be modified.

Defendants are further ordered to file herein, and serve upon plaintiff, on or before December 15, 1975, (unless such period is further extended), a progress report upon their compliance with the foregoing order, or, in lieu of compliance, a report, showing cause why compliance has not been made, is not being

7. For the purpose of the foregoing, a "reasonable time" for the taking of steps as above ordered is found and hereby defined to be 60 days after October 15, 1975 (the date

or will not be made with the foregoing order.

The Court reserves power to make such further orders as may be found to be advisable or necessary in connection with the subject matter.

## APPENDIX

1. Section 79c(e) further provides that no acquisition other than by donation shall be effectuated and no cooperative agreement shall be executed by the Secretary under this subsection until sixty days after he has notified the Congress of his intended action and the costs and benefits to the United States involved therein.

4. The Secretary points out that he has already exceeded the $92,000,000 authorized by the Congress for carrying out the purposes of the Act; that $69,200,000 of this authorized amount has already been paid in compensation for lands taken to establish the Park; that he has recently, in 1974, settled and agreed to pay similar land acquisition compensation to Arcata Redwood Company, one of the timber operators, in the amount of $35,300,000, making a total of $104,500,000 already paid or obligated for land acquisition. Further, the Secretary notes additional land acquisition claims, not yet resolved, in the amount of $106,000,000.

Plaintiff responds that the $35,300,000 the government has only recently agreed to pay to the Arcata Company must be considered against the fact of six years of previous inaction by the Secretary; further, that the Arcata settlement is not necessarily a charge against the $92,000,000 authorized by Congress for land acquisition purposes but may instead be payable from general funds for payment of Court of Claims judgments [see 28 U.S.C. § 2517; 31 U.S.C. § 724a]; that this is at the least an open question; also that the pending $106,000,000 claims of other former landholders are only the claims the ultimate amount of which may be substantially less.

on which defendants pending so-called Janda Report may reasonably be expected), i. e. December 15, 1975.