532 F.2d 280
 8 ERC 1891, 6 Envtl. L. Rep. 20,331
 SUN ENTERPRISES, LTD., et al., Plaintiffs-Appellants,
v.
Russell E. TRAIN, as Administrator of the U. S.
Environmental Protection Agency ("EPA"), et al.,
Defendants-Appellees,
and
Heritage Hills of Westchester, et al., Defendants-Intervenors.
SUN ENTERPRISES, LTD., et al., Petitioners,
v.
ADMINISTRATOR OF the U. S. ENVIRONMENTAL PROTECTION AGENCY,
Russell E. Train, Respondent,
and
Heritage Hills of Westchester, et al., Intervenors.
 Nos. 490, 647, Dockets 75-6068, 75-4164.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 14, 1976.
Decided March 12, 1976.
 
 Nicholas A. Robinson, New York City (Marshall, Bratter, Greene, Allison & Tucker, New York City, of counsel), for appellants-petitioners.
 William Roche Bronner, Asst. U. S. Atty., New York City (Thomas J. Cahill, U. S. Atty., S. D. N. Y., Steven J. Glassman, Asst. U. S. Atty., Richard G. Tisch, Atty., Region II, EPA, New York City, of counsel), for appellees and respondent.
 Arthur S. Olick, Anderson, Russel, Kill & Olick, P. C., New York City (Davis M. Zimmerman, Jerold Oshinsky, Tarrytown, N. Y., Jane S. Solomon, New York City, Blasi & Zimmerman, Tarrytown, N. Y., of counsel), for intervenors.
 Laurance Rockefeller, Ross Sandler, Natural Resources Defense Council, Inc., New York City, as amicus curiae.
 Before LUMBARD, SMITH and MANSFIELD, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 This is a consolidated original petition for review and an appeal, the petition challenging the issuance of a National Pollutant Discharge Elimination System (NPDES) permit by the Environmental Protection Agency (EPA), and the appeal questioning the dismissal on jurisdictional grounds by Judge Dudley B. Bonsal of a similar challenge initiated in the District Court for the Southern District of New York. 394 F.Supp. 211 (S.D.N.Y.1975). The disputed action is the issuance of an NPDES permit to the intervenors by the Administrator of EPA pursuant to § 402 of the Federal Water Pollution Control Act Amendments of 1972 ("Water Act"), 33 U.S.C. § 1342. The permit authorizes sewage disposal into Brown Brook in the Town of Somers in Westchester County, New York. For reasons given below we affirm the district court's dismissal on jurisdictional grounds and deny the petition for review as untimely.
 
 
 2
 The appellants-petitioners, who were plaintiffs below, are: Sun Enterprises, Ltd. (Sun), a corporation which owns over 500 acres of land downstream of the discharge point in the Town of Somers, Westchester County; Southern New York Fish and Game Association, Inc., a non-profit fishing and hunting society in the area; Lyman E. Kipp, the president of Sun who lives on the Sun property; Richard E. Homan, a tenant of Sun and an officer of Southern New York Fish and Game Association; No Bottom Marsh, the marsh through which the brook which receives the discharge flows; and Brown Brook, which is classified by New York State as a trout stream on Sun's property. The appellees, defendants below are: Russell E. Train, Administrator of EPA, also the respondent in this proceeding; Gerald Hansler, Regional Administrator of EPA for Region II (which includes New York); and Rogers Morton, former Secretary of the Department of the Interior (Interior). The intervenors, defendants below, are Heritage Hills of Westchester (HHW), a partnership, its principals and related corporations all of whom are engaged in the construction of a condominium housing project, in Somers, which will consist of 3,100 units and extensive recreational facilities upstream of the Sun property.
 
 
 3
 The facts which gave rise to this litigation are as follows. On July 12, 1973 HHW applied to the New York State Department of Environmental Conservation (DEC) for permission to relocate approximately 650 feet of Brown Brook in order to construct a sewage treatment plant for the housing project. By the terms of its zoning special exception permit, HHW was obliged to provide its own sewage system. At the relocation hearings appellant Kipp presented expert testimony on what he contended would be the adverse effects of sewage discharge at the proposed site on the brook, the marsh, and on an aquifer (an underground drinking water supply) located on Sun's property. Nevertheless, on January 17, 1974, the application for stream relocation was approved by the Commissioner of DEC.
 
 
 4
 In December, 1973, HHW applied to the EPA for a NPDES permit (33 U.S.C. § 1251 et seq.). Pursuant to § 401 of the Water Act (33 U.S.C. § 1341), EPA referred the application and a proposed permit to the DEC for certification that the proposed permit would comply with the applicable sections of the Water Act. On April 30, 1974 the EPA published notice of its intent to issue the NPDES permit in the Peekskill Star, a newspaper of apparently general but limited circulation in the affected area. The notice stated that EPA would receive written comments from interested persons, but would hold no hearings unless a hearing were requested. The DEC also published notice of the application in the Reporter Dispatch, a newspaper of greater circulation in the area.
 
 
 5
 In May, 1974 Kipp wrote to both the DEC[1] and EPA warning of the adverse consequences to the marsh and aquifer if the permit were granted. In his letter to the EPA Kipp did not request a hearing; however he did ask for acknowledgment of his letter and a statement by EPA of its proposed actions to prevent the "destruction" feared by Kipp. EPA, apparently viewing the letter as a written comment in response to its public notice, did not respond to the letter. However, an interoffice memo indicates that the EPA did consider the May, 1974 letters addressed to both it and the DEC. According to that memo, a review of the findings of the DEC after the brook relocation hearings satisfied the EPA that Kipp's position had been considered and raised no impediment to the issuance of a permit.
 
 
 6
 During this period in the spring of 1974 EPA sent a copy of the proposed permit to the appropriate office of Interior in accordance with EPA's duty to consult with Interior under the Fish and Wildlife Coordination Act (hereinafter "Coordination Act"), 16 U.S.C. § 661 et seq.[2] Interior responded with a letter listing over 80 NPDES applications, including intervenor's, as to which it contemplated "no action" due to a "lack of personnel."
 
 
 7
 After receiving DEC certification of the appropriate discharge limits, the EPA issued an NPDES permit to HHW on July 12, 1974. The permit contains limits on the biochemical oxygen demand, suspended solids, fecal coliform, and pH. Certain state restrictions which are more stringent than the federal requirements are included in the permit. Moreover, the chlorination necessary to achieve the required fecal coliform level is to be controlled by a chlorine limitation for the effluent. Limits on oxygenation, ammonia, phosphorus and settleable solids are all provided for in the permit. Self-monitoring, record keeping, reporting conditions, and structural fail-safe device requirements are also included in the permit. No examination of the adequacy of these various terms is called for here since we have determined that the merits of appellants-petitioners' challenge to the permit are not properly presented by this proceeding.
 
 
 8
 DEC wrote to Kipp both before and after the permit was issued to say that it would not accede to Kipp's request that it hear further testimony by his experts.[3] In August, 1974, apparently unaware that the permit had been issued, Kipp commenced a mandamus proceeding in state court to compel the DEC to hear additional expert testimony before certifying any limits to EPA. The litigation was discontinued that same month when Kipp was informed that the permit had already been issued. The DEC, by letter dated September 3, 1974, formally advised Kipp that the permit had been issued.
 
 
 9
 On January 8, 1975 appellants filed an action in the District Court for the Southern District which, in pertinent part,[4] charged the federal defendants with numerous due process violations in the issuance of the permit. The basic allegations in the complaint against EPA are that it failed to implement its own regulations on the preservation of wetlands (38 Fed.Reg. 10834), failed to give the public notice of and the opportunity to comment on or request a hearing on the proposed permit, violated the standard set out in § 302 of the Water Act (33 U.S.C. § 1312), and deprived appellants of property without just compensation. Both EPA and Interior were also charged with failing to consult under the Coordination Act.
 
 
 10
 On May 9, 1975 Judge Bonsal dismissed the complaint as to the federal defendants. He held that those claims asserted solely against the Administrator of the EPA challenged the Administrator's actions in issuing the permit and are only reviewable in the court of appeals pursuant to § 509(b)(1) of the Water Act, 33 U.S.C. § 1369(b)(1).[5] As to the alleged failure of EPA and Interior to consult, the district court denied appellants' motion for summary judgment, but granted summary judgment on its own motion to appellees EPA and Interior dismissing the Coordination Act claim. Pursuant to Rule 54(b), Fed.R.Civ.P., the district court entered a final judgment of dismissal on July 24, 1975.
 
 
 11
 The appeal from this judgment has been consolidated, as noted above, with a § 509(b)(1) petition for review of the permit's issuance which was filed in this court on July 31, 1975. A motion to dismiss the petition as untimely was denied without prejudice to its renewal.
 
 
 12
 Intervenors challenge the entry of final judgment by the district court pursuant to Rule 54(b), Fed.R.Civ.P. They argue that the appeal should be dismissed as interlocutory since the grant of final judgment involved no exercise of discretion by the district court. See Schwartz v. General Transatlantique, 405 F.2d 270 (2d Cir. 1968). In the alternative they urge affirmance of the district court and dismissal of the petition for review. We find that the entry of final judgment was proper and logical since the dismissal of all claims against the federal defendants contained an implicit finding that there was no reason for delay.
 
 
 13
 In dismissing the complaint as to the EPA, Judge Bonsal held, as noted above, that a § 509(b)(1) petition addressed to the court of appeals is the exclusive vehicle for review of the Administrator's action is issuing an NPDES permit.
 
 
 14
 Appellants argue that jurisdiction existed in the district court under (1) the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., (2) general federal question jurisdiction, 28 U.S.C. § 1331, (3) mandamus jurisdiction, 28 U.S.C. § 1361 and (4) § 505 of the Water Act, 33 U.S.C. § 1365. It is their position that the alleged due process, wetlands regulations, and Coordination Act violations give rise to causes of action which are separate and distinct from the Water Act and are properly sued upon in the district court under the APA or general federal question jurisdiction. They argue that the savings clause of § 505 of the Water Act,[6] the general citizen's suit provision, preserves to plaintiffs any form of relief which they may have had independently of the Act. See N.R.D.C. v. Callaway, 524 F.2d 79 (2d Cir. 1975).
 
 
 15
 Appellants further argue that the violations alleged against appellees constitute failures to perform non-discretionary duties. As such, it is urged, redress of the violations is properly sought in the district court under 28 U.S.C. § 1361, mandamus jurisdiction, and § 505(a)(2)[7] of the Water Act which permits suit in the district court against the Administrator of EPA for failure to perform a non-discretionary act. As to the alleged violations of § 302 in the actual issuance of the permit, appellants appear to admit that this claim is properly pursued under § 509 in the court of appeals and press the claim only as part of their § 509 petition.
 
 
 16
 The appellees respond, and we agree, that there is a strong presumption against the availability of simultaneous review in both the district court and the court of appeals. Review of the Administrator's actions in issuing or denying a permit must, by the explicit terms of § 509, be sought in the court of appeals whose jurisdiction is, absent extraordinary conditions, exclusive.[8] See Oljato Chapter of Navajo Tribe v. Train, 169 U.S.App.D.C. 195, 515 F.2d 654 (1975); Granite City Steel Co. v. EPA, 501 F.2d 925 (7th Cir. 1974); Anaconda Co. v. Ruckelshaus, 482 F.2d 1301 (10th Cir. 1973).
 
 
 17
 Section 505(a)(1) of the Water Act provides jurisdiction in the district court where there is an alleged violation of an effluent standard or limitation or an alleged violation of an order of the Administrator or a State with respect to such a standard or limitation. As the district court's thorough analysis points up, the only effluent limitations in question in this suit are those set by the Administrator. It is clear that he is not, nor could he logically be, in violation of those limits. To the extent that appellants are challenging the promulgation of those limits, they are required to do so in the court of appeals.
 
 
 18
 Nor do § 505(a)(2) or 28 U.S.C. § 1361 justify the district court suit. It is not the failure of the Administrator to perform a non-discretionary duty which is at issue; rather it is the manner in which those duties were performed which appellants are challenging. Review of the actions of the Administrator in issuing or denying a permit must be sought, as we have held, under § 509 in the court of appeals.
 
 
 19
 If, as we have found, § 505 provides no jurisdictional basis for appellants' suit in the district court, then the savings clause of § 505 (33 U.S.C. § 1365(e)) cannot afford them any relief. Section 509 contains no such savings clause. Thus the alternate bases for jurisdiction urged by appellants are of no avail. In any case, the APA, 5 U.S.C. § 704, applies, by its own terms, only where "there is no other adequate remedy in a court . . . ." The availability of § 509 review precludes the application of 5 U.S.C. § 704. See Oljato, supra, 515 F.2d at 663; Getty Oil Co. (Eastern Operations) v. Ruckelshaus, 467 F.2d 349, 356 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).
 
 
 20
 In denying appellants' motion for summary judgment against the federal defendants for violation of the Coordination Act, the district court observed that the EPA had in fact sent Interior "the public notice, fact, sheet, and tentative determinations" on intervenor's application.[9] The district court held that any challenge to the permit because it was issued in the absence of substantive comment from Interior was a challenge to the action of the Administrator in issuing the permit and must be addressed to the court of appeals.
 
 
 21
 Appellants argue that EPA failed to send adequate information to alert Interior to the true nature of intervenor's application. However, such a claim goes to the manner in which the Administrator performed, not to the failure to perform. The claim must, as the district court held, be reviewed in a § 509 petition to the court of appeals.
 
 
 22
 As to Interior, the district court expressed uncertainty as to whether there existed a private right of action under the Coordination Act. After distinguishing many of the cases relied upon by appellants as involving failures by other agencies either to consult with Interior or adequately to consider Interior's recommendation (see, e. g., Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967); Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972)), the court went on to indicate that it could not find Interior's failure to comment to be an abuse of discretion. In making this observation, the court cited Interior's enormous workload and shortage of funds and personnel. An additional consideration were the safeguards in the Water Act (33 U.S.C. §§ 1251, 1312, 1342) which require the EPA to consider and protect fish and wildlife in issuing NPDES permits.
 
 
 23
 Following this analysis, the district court granted summary judgment in favor of appellees dismissing the claim for relief under the Coordination Act. Appellants argue that in granting summary judgment to appellees, the district court must have found jurisdiction to exist for this claim, at least as to Interior. However, it is unclear from the district court's grant of summary judgment "dismissing" the complaint that in fact jurisdiction was ever found to exist.
 
 
 24
 Certainly it would be an unsatisfactory result if the otherwise exclusive mode of review of an NPDES permit's issuance, a § 509 petition to the court of appeals, could be circumvented by an action in the district court against Interior. If the failure of Interior to respond substantively to the EPA is reviewable,[10] review must be sought by a § 509 petition challenging the issuance of a permit in the absence of either any comment or exercise of discretion not to comment by Interior.
 
 
 25
 Although such a petition is time-barred in this case, we are obliged to note Interior's apparent failure not only to comment on, but even to review the application forwarded to it by EPA. Interior argues that the Coordination Act is directed toward agencies other than Interior and that is free either to waive its right to receive applications or to defer to another agency. See Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). Appellees urge a unilateral interpretation of the word "consult" as used in the Coordination Act. Under this interpretation EPA's simply sending the intervenor's NPDES permit application to Interior is claimed to have satisfied the consultation requirement so that Interior was not obliged to respond to EPA.
 
 
 26
 Indeed, EPA's regulations for compliance with the Coordination Act state that Interior may waive its right to receive permit applications and that failure to respond to EPA within an allotted period of time will be deemed a statement by Interior that it does not choose to comment at that time. 40 C.F.R. § 125.4(f) (1). However, this EPA regulation is not authority for a waiver by Interior; it is simply an administrative procedure designed by EPA for fulfilling its responsibilities under the Coordination Act. The possibility of Interior's waiving the receipt of NPDES permit applications, as suggested by the EPA regulation, has occasioned serious Congressional concern. See hearings, supra, note 9, at 1347-48.
 
 
 27
 Correspondence during 1973 from members of Congress[11] who were actively involved in the drafting and oversight of the Water Act to the Departments of the Interior and Commerce, which have similar responsibilities under the Coordination Act, strongly urged the agencies not to waive their rights and responsibilities under the Coordination Act. Hearings, supra, note 9, at 1345-61. The procedure which Interior followed in this case was discussed in that correspondence as a more acceptable alternative than a waiver where no substantive comment is possible. However, a letter from the same Congressmen to the district court in this action indicates that any blanket policy of failure to comment, even if ascribed to economic constraints, does not comport with the legislators' understanding of the law nor with their intent.[12]
 
 
 28
 The problem has been somewhat resolved, since the dismissal of the district court action, by Interior's promulgation of proposed interim guidelines for screening NPDES permits to determine which will have "no" or "inconsequential impact on fish and wildlife resources" and which merit closer scrutiny. 39 Fed.Reg. 29552, 29555 (1974); see also 40 Fed.Reg. 55809 (1975).
 
 
 29
 Nevertheless, it is argued by appellees that these guidelines do not constitute an admission that Interior is obliged to review or comment on the applications. The district court suggested that the lack of any express requirement that Interior respond to EPA is an implicit grant of discretion to Interior allowing it to utilize its resources as it sees fit. In the same vein, appellees argue that Interior has less expertise and fewer resources than EPA or DEC and that practical necessities of funding and management require that Interior be free to allocate its resources as it sees fit. See Hearings, supra, note 9, 1350.
 
 
 30
 However, the fact that NPDES permits are exempted from the full requirements of the National Environmental Policy Act, 42 U.S.C. § 4321, (see 33 U.S.C. § 1371(c)(1)) taken together with the legislative intent that the Coordination Act apply to NPDES permits (see note 9 supra), renders the consultation requirement of the Coordination Act especially important in the context of NPDES permits. The facts that a stated goal of the Water Act is "the protection and propagation of fish, shellfish, and wildlife" (33 U.S.C. § 1251(a)(2)) and that state certification procedures exist (33 U.S.C. § 1341) as an additional check on EPA action in issuing NPDES permits do not justify an administrative conclusion that the consultation requirements of the Coordination Act are superfluous and dispensable. Interior itself has repeatedly recognized the importance of safeguarding the nation's wetlands, even as recently as in its proposed screening Regulations. See 39 Fed.Reg. 29555-56 (1974). To employ a narrow construction of the word "consult," as urged, would be to emasculate the Coordination Act.
 
 
 31
 Interior's position that funding and personnel are inadequate to meet the burdensome demands of reviewing NPDES permits is entitled to little weight as it has failed to request the funds and personnel necessary for it to fulfill its responsibilities.[13] There has been some indication that Interior's failure to request adequate funds was due to limitations placed on it by the Office of Management and Budget. Whatever the reason, while we appreciate the difficulties involved in reviewing the large number of applications forwarded by EPA to Interior, we cannot condone what amounts to administrative or executive repeal of an act of Congress. See generally Calvert Cliffs' Coord. Comm. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Sierra Club v. Dep't of Interior, 398 F.Supp. 284 (N.D.Cal.1975).
 
 
 32
 Turning next to the § 509(b)(1) petition to review the action of the Administrator in issuing the NPDES permit, we hold that it is time-barred. Section 509(b)(1) clearly sets forth a 90 day limitation period which we construe to be a statute of limitations. See Peabody Coal Co. v. Train, 518 F.2d 940 (6th Cir. 1975). See also Oljato Chapter of Navajo Tribe v. Train, 169 U.S.App.D.C. 195, 515 F.2d 654 (1975) (applying the 30 day limitation period of the Clean Air Act, 42 U.S.C. § 1857h-5(b)(1)). The legislative history of section 509(b)(1) (see note 8 supra) reveals that the 90 day limit represents an expansion of a 30 day limit originally drafted into both the Senate and House versions of the section.
 
 
 33
 Petitioners' argument that Peabody Coal is distinguishable because it involved the approval of a state-wide plan rather than the issuance of a single permit must fail. The possibility of an error by the Administrator carries more serious risks in the approval of a state-wide plan than in the issuance of a single permit. Nevertheless, the court in Peabody Coal held that the 90 day limit was a bar to a petition filed 92 days after the challenged action.
 
 
 34
 Petitioners in this case filed their petition over a year after the permit had been issued. Petitioners would have us toll the statute of limitations on an equitable estoppel theory premised on the alleged failure of EPA to give notice. It is unclear whether the alleged failure to give notice relates to notice of the pendency of the application or notice that the permit had been issued. Without passing on the adequacy of notice in the first instance or the necessity of notice in the latter connection, we must deny this application for equitable relief. Petitioners Sun and Kipp apparently received actual notice of the permit's issuance in August of 1974; they admittedly received written notice in September of 1974; the remaining petitioners received notice by October of 1974. The district court action was commenced on January 8, 1975. Yet, the instant petition was not filed until July 31, 1975.
 
 
 35
 Petitioners' alternate theory in support of the petition is that the grounds on which the petition is based arose after the 90 day period had run and, consequently, under § 509(b)(1), the petition is timely as it was " based solely on grounds which arose after such ninetieth day." 33 U.S.C. § 1369(b) (1). The alleged failure to give notice obviously arose, and as demonstrated above was discovered, before the 90 day period had elapsed. Likewise the extent of consultation under the Coordination Act is not a ground arising after the limitation period had run; it was a part of the administrative record and was available to petitioners throughout the 90 day period. Even accepting petitioners' representation that the facts surrounding this issue were not known to them until the institution of the district court action, this late knowledge is not chargeable to respondent. In any case, the petition was not even filed within 90 days of such knowledge.
 
 
 36
 The challenge to the actual terms of the permit on the grounds that EPA failed to adhere to its own wetlands regulations or failed to consider the impact of the discharge downstream cannot possibly be viewed as having arisen after the 90 day period. The additional scientific data collected by and offered through the expert who testified for petitioners at the DEC hearings is just that: additional evidence in support of the position petitioners have maintained throughout the proceedings. It does not constitute new grounds for a petition.
 
 
 37
 Finally, the ruling of the district court that it lacked jurisdiction can hardly be construed, as urged by petitioners, to be newly arising ground for filing the petition.
 
 
 38
 The apparent harshness of denying the petition is mitigated by a number of factors. There is the history of petitioners' substantial participation in and input into the proceedings from the outset. There is also the opportunity available to petitioners to present any complaint or new evidence to the EPA.
 
 
 39
 To the extent that petitioners gather evidence of a violation of the permit they are free to bring it to the attention of the Administrator for appropriate action or, after giving the required notice, to commence a citizen suit against either the violator or the Administrator or both. See 33 U.S.C. §§ 1319, 1365; 40 C.F.R. § 135 (1973). Past action on such a complaint demonstrates the availability of this procedure. A letter dated May 1, 1975 from the EPA to counsel for petitioners responded to petitioners' complaint of an alleged violation of the permit. Investigation of petitioners' charge had revealed that the violation which was said to have occurred on February 27, 1975 was not possible since it predated any discharge, other than pure water, by intervenor.
 
 
 40
 Nor is the presentation of new evidence to EPA a meaningless exercise since the terms of the permit reserve to EPA the right to modify, suspend, or revoke the permit for cause after notice and the opportunity for a hearing.[14] Petitioners' informal oral request to EPA in the Fall of 1974 for a hearing to reconsider the permit cannot be viewed as a presentation of new evidence which was rejected or which demonstrated the futility of this procedure.
 
 
 41
 Moreover, the permit is, by its terms, limited to five years' duration. Should a more restrictive effluent standard be established under § 307(a) of the Water Act, 33 U.S.C. § 1317, the permit will be modified to reflect the new standard.
 
 
 42
 Finally, the equities of this case lie heavily with the intervenors who have proceeded at great expense[15] in reliance on the permit and who cannot be charged with any deficiencies in respondent's performance.
 
 
 43
 For the above reasons the appeal from the judgment of the district court is affirmed and the petition is denied.
 
 
 
 [1]
 Kipp, through counsel, had earlier written several times to the DEC in connection with HHW's application for a state discharge permit
 
 
 [2]
 The Coordination Act at 16 U.S.C. § 662 states in pertinent part:
 (a) Except as hereafter stated in subsection (h) of this section, whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein the impoundment, diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development.
 
 
 [3]
 There is a dispute as to how fully Kipp was allowed to present his expert testimony at the brook relocation hearings. Although the hearing examiner declined to hold a separate hearing on the question of a state discharge permit, the record which has been relied upon by the DEC and EPA in connection with the NPDES permit discloses that Kipp was afforded and availed himself of a significant opportunity to present expert testimony on the very issues which would have been covered at such a hearing
 
 
 [4]
 The DEC is not a party to this appeal although it was a defendant in the action below
 
 
 [5]
 Section 509(b)(1) of the Water Act, 33 U.S.C. § 1369(b)(1), provides:
 (b)(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title, and (F) in issuing or denying any permit under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.
 
 
 [6]
 Section 505(c), 33 U.S.C. § 1365(e), provides that:
 (e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).
 
 
 [7]
 Section 505(a), 33 U.S.C. § 1365(a), provides in pertinent part:
 (a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf
 (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
 The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.
 
 
 [8]
 The legislative history of § 509 reveals that its provision for review of NPDES permits in the court of appeals within 90 days of the permit's issuance differs from both the original Senate version of the section which provided for review in the court of appeals subject to a 30 day statute of limitations and the House version which provided for review in the district court also within 30 days. See S.Rep.No.92-414, 92d Cong., 1st Sess. (1971), 1972 U.S.Code Cong. & Admin.News pp. 3668, 3751; H.R.Rep.No.92-911, 92d Cong., 2d Sess. 58 (1972); S.Conf.Rep.No.92-1236, 92d Cong., 2d Sess. (1972), 1972 U.S.Code Cong. & Admin.News pp. 3776, 3825
 
 
 [9]
 The district court expressly refrained from deciding the applicability of the Coordination Act to NPDES permits since neither the plaintiffs nor the defendants disputed its applicability. Consequently, it assumed for purposes of the motion that the Coordination Act was applicable to NPDES permits
 At argument on appeal and in post-argument submissions the appellees have contended that the Coordination Act does not apply to most NPDES permits. Under this theory, while Congress apparently intended to make the Coordination Act applicable to NPDES permits, in fact Congress limited its application to permits allowing discharges which would accumulate and result in the impoundment, diversion, or modification of a body of water. See 16 U.S.C. § 662. Appellees go on to argue for a narrow construction of the term "modification." See Hearings Before the Conservation and Natural Resources Subcomm. of the House Comm. on Government Operations, 93d Cong., 1st Sess., Appendix 4, Part C, Correspondence Re: Applicability of Fish and Wildlife Coordination Act at 1291-94 (1973) (hereinafter "Hearings"). However, a narrow construction of the term is inappropriate in the light of Congressional intent that the Act apply to NPDES permits. Senate Comm. on Public Words, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972 at 331-32, 651 (Comm. Print 1973) (2 vols.).
 In any case, in order for Interior to determine whether or not an application is one which falls within its scope of review, some degree of study and exercise of discretion is necessary.
 Finally, as the district court found, this question appears to have been resolved within the Executive Branch itself in favor of the applicability of the Coordination Act to NPDES permits. See Hearings at 1342.
 
 
 [10]
 The appellees argue that if Interior has a right of action to enforce the Coordination Act, it is a right which Interior can waive. See Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). While acknowledging that the Coordination Act has been invoked in connection with private suits under the National Environmental Policy Act, 42 U.S.C. § 4331, appellees argue that there is no independent private right of action under the Coordination Act. See Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971); Environmental Defense Fund v. Corps of Engineers, 324 F.Supp. 878 (D.D.C.1971)
 Without holding whether or not such a private right of action does exist, we note that compliance with the Coordination Act might be a consideration in connection with a § 509 petition for review of an NPDES permit. In any case, as far as New York State is concerned, on October 28, 1975 EPA delegated its permit issuing function to the DEC which, as a state agency, may not be required to consult with Interior under the Coordination Act. But see Hearings, supra note 9, at 1269, 1272, 1276, 1297, 1335, 1363, 40 Fed.Reg. 55809, 55811 (1975).
 
 
 [11]
 The principal correspondents were Congressmen John D. Dingell and Henry S. Reuss, Chairmen of the House Subcommittees on Fisheries and Wildlife Conservation and the Environment and Conservation and Natural Resources respectively
 
 
 [12]
 Appellants-petitioners' Document Appendix at A-146
 
 
 [13]
 See Hearings on G.A.O.Rep. B-118370 and H.R. 42, H.R. 2285, H.R. 2288, H.R. 2291, H.R. 2292, H.R. 10651 and H.R. 14527, Before the Subcomm. on Fish and Wildlife, Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries, 93d Cong., 2d Sess., ser. 33 at 121, 538, 601 (1974)
 
 
 [14]
 This reservation of EPA's rights in the permit suggests the wisdom of the procedure recommended in Oljato Chapter of Navajo Tribe v. Train, 169 U.S.App.D.C. 195, 515 F.2d 654, 665-67 (1975); and in Union Electric Co. v. EPA, 515 F.2d 206, 220 (8th Cir. 1975), cert. granted, 423 U.S. 821, 96 S.Ct. 35, 46 L.Ed.2d 38, 44 U.S.L.W. 3200 (1975), in the context of the Clean Air Act, 42 U.S.C. § 1857 et seq. Under that procedure, review of allegations that the Administrator has failed to give due consideration to new evidence is deferred until after such evidence has been presented to him and a reviewable record has been created
 
 
 [15]
 Approximately $23,000,000 has been expended by intervenors since 1972 in order to complete approximately 340 units of the project, 128 of which are already occupied